1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

HONORABLE ROBERT J. BRYAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

    Plaintiff and Counterclaim-Defendant,

    v.

WASHINGTON STATE DEPARTMENT
OF TRANSPORTATION,

    Defendant and Counterclaimant.

NO. 3:08-cv-05722-RJB

DEFENDANT WSDOT'S
RESPONSE TO UNITED STATES'
MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL
TAR

NOTE ON MOTION CALENDAR:
June 18, 2010

## I.    RELIEF REQUESTED

Defendant Washington State Department of Transportation (WSDOT) requests that the court deny the United States' motion for partial summary judgment regarding coal tar contamination, on the grounds that there are disputed issues of material fact regarding (1) whether WSDOT can be an "owner or operator" of the "facility" when the United States alleges it incurred costs in the Thea Foss Waterway (Waterway), which WSDOT neither owns nor operates, and (2) whether coal tar from South A Street was actually released at the Thea Foss Waterway and resulted in the United States' cleanup costs at the Waterway.

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

1

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

## II.     STATEMENT OF FACTS

### A.     Construction of South A Street Drain System

When it built SR 705, WSDOT built South A Street at the request of the City of Tacoma to connect downtown Tacoma with Dock Street and the waterfront.[1]  Because of the terrain, WSDOT had to excavate, discovering coal tar contamination from a former manufactured gas plant (MGP).  WSDOT removed a significant amount of contamination during this part of the project, excavating below the level where the gas plant had been, at a cost of over $5 million.  Declaration of Deborah L. Cade Opposing United States' Motion for Partial Summary Judgment Re Coal Tar,[2] Ex. 1, at 777-795; Ex. 9, at 3.

Because of a high water table, the design for South A Street included a French drain system to protect the roadway from water damage.  The French drain connected to the street's stormwater drain, which then connected with the City storm sewer system, which eventually empties into the Thea Foss Waterway through the "West Twin" drain at the head of the Waterway.  Ex. 1, at 786:5-17.  WSDOT installed both the French drain and the storm drain in clean soil after removing any contaminated soil and backfilling the area with clean soil.  Ex. 1, at 784:21–785:15; 794:6-795:20.   WSDOT completely removed any coal tar that it encountered in the excavation, and "overexcavated" to remove any coal tar or "oily silt and sand" contamination.  When contaminated pipes extended beyond State property, WSDOT filled the opening with concrete to prevent the movement of any contamination.  Ex. 1, at 782:8-783:18.  The records kept by the construction inspection staff support this conclusion.  Ex. 2.

---

[1] The term "DA-1" is often used to describe either South A Street or its drainage system.  "DA-1" comes from the designation on the construction plans for the centerline of the reconstructed South A Street, which was intended to connect Dock Street to the rest of South A Street.  Ex. 1, at 784:4-12.

[2] Unless otherwise noted, all exhibit references are to the Declaration of Deborah L. Cade Opposing United States' Motion for Partial Summary Judgment Re Coal Tar.

DEF. WSDOT'S RESPONSE TO UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT RE COAL TAR 3:08-CV-05722-RJB

2

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126    Facsimile:  (360) 586-6847

**B.      Discovery of Coal Tar in South A Street Drains**

In May 1992, the Department of Ecology (Ecology) discovered that coal tar had apparently migrated through the clean material into the French drain system and into a catch basin.  There is no evidence that it was reported to WSDOT prior to May 1992.  The City plugged the connections between the French drain and the catch basins to prevent further migration into the storm sewer system.[3]  Declaration of Jeffrey Sawyer Opposing United States' Motion for Partial Summary Judgment Re Coal Tar (Sawyer Decl.).  The City and Ecology then considered using the French drain system to capture the coal tar contamination; they did not want WSDOT to remove it at that time.  Exs. 3 and 4.  In April 1995, Ecology's site manager wrote to WSDOT and the City of Tacoma about possible remedies for the drain system, including using the French drain as part of a treatment system.  The site manager recognized the need to provide for continued stormwater removal and removal of groundwater to protect the road.  Ex. 4.  By 1996, that option had been rejected.  During SR 509 construction, WSDOT removed sections of the French drain that were connected to catch basins, removed contaminated soil, plugged the remaining drains with concrete, and replaced contaminated catch basins, all pursuant to an agreed order from Ecology.  Sawyer Decl.

WSDOT worked with the City to develop options for access to Dock Street that would eliminate potential contamination to the storm drain, while meeting the City's demand to maintain storm drainage adequate to keep South A Street open.  Although they developed a workable solution, the City could not fund the $4 million project.  Finally, without the funds to comprehensively fix South A Street and with the Environmental Protection Agency's (EPA) impending deadline for source control, WSDOT removed pipe to cut off the South A Street drainage from the City's storm sewer system.  Since that time, South A Street floods and is closed during rain storms.  Sawyer Decl.  The City has now replaced it with the East D Street

---

[3] There was no "third drain line;" subsequent reports misinterpreted the plans by reading the center line of the street as a third drain line.  Ex. 1, at 789:6-17.

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

3

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

1   overpass, which connects Puyallup Avenue to Dock Street. Throughout this time, WSDOT's
2   regional environmental manager not only worked with City and Ecology staff to reach a
3   solution for the storm drains and keep the street open, but also kept the City's stormwater
4   manager apprised of WSDOT's actions so that he could inform the group that was working on
5   source control with EPA. Sawyer Decl.

6   **C.      Chemical Analysis of Waterway Sediments**

7       WSDOT's expert chemist, Helder Costa, after examining contamination trends over
8   time, determined that the increase in contamination had occurred throughout the Waterway, not
9   just near the "West Twin" outfall that would have been impacted by the South A Street drains.
10  He also reviewed a report by the United States Geological Survey documenting similar
11  increasing polycyclic aromatic hydrocarbons (PAH) trends at numerous waterways nationwide,
12  including one just north of Seattle; that report attributed this increase to increased urbanization.
13  Mr. Costa concluded that, based on this evidence, the increase in sediment PAH concentration
14  was likely a regional trend. Mr. Costa theorized that this trend could be the result of increased
15  urbanization, as the U.S. Geological Survey report concluded, or that it could be associated
16  with increased wood stove use, since wood stoves produce significant atmospheric PAH that
17  ultimately ends up in stormwater. Declaration of Helder J. Costa Opposing United States'
18  Motion For Partial Summary Judgment Re Coal Tar (Costa Decl.), Ex. 1, at 7-9.

19      Mr. Costa also applied a chemical forensic analysis of the sediments themselves and
20  determined that stormwater PAH, not coal tar, caused the increased sediment PAH
21  concentrations. Costa Decl., Ex. 1, at 17. Another WSDOT expert, Kirk Winges, opined that
22  changes in atmospheric PAH sources, namely vehicle traffic, wood stoves, and industrial uses,
23  could account for the variations seen in the sediment PAH concentrations. Declaration of
24  Kirk D. Winges Opposing United States' Motion for Partial Summary Judgment Re Coal Tar
25  (Winges Decl.), Ex. 1.

26

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

4

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

1

## III.   ARGUMENT

2  **A.   Summary Judgment is Not Appropriate When the Facts Do Not Support a
3  Conclusion That WSDOT is an Owner or Operator and When There Are Genuine
   Issues of Material Fact**

4          Summary judgment may be granted only if there are no genuine issues of material fact

5  and the moving party is entitled to judgment as a matter of law.  The court must view any

6  inferences drawn from the facts in the light most favorable to the nonmoving party.

7  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89

8  L.Ed. 2d 538 (1986).  There are genuine issues of material fact with regard to whether the

9  material that infiltrated the drain system contributed to any contamination found in the

10 Waterway sediment.   The fact that both the coal tar in the drains and the sediment

11 contamination contain polycyclic aromatic hydrocarbons (PAH) is not by itself determinative

12 of this question.  PAH comes from a number of sources, including both coal tar and also the

13 stormwater runoff that makes up the background contamination level found throughout the

14 area.  Whether the sediment PAH comes from this coal tar or from the urban background is a

15 factual issue inappropriate for summary judgment.

16         Also, the facts do not establish that WSDOT is an "owner or operator of the facility"

17 when the United States' costs were incurred in regard to cleanup of the Thea Foss Waterway,

18 not in the cleanup of the storm drain/French drain system.  The United States is not entitled to

19 summary judgment on this issue.

20 **B.   WSDOT is Not Liable as a Matter of Law Because It Never Owned or Operated
   the Facility at Issue in this Lawsuit**

21         WSDOT is not liable pursuant to § 107(a)(1) and (2) of the Comprehensive

22 Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. §

23 9607(a)(1) and (2)) as the current or former owner of a facility from which there was a release

24 of a hazardous substance.  Although the State of Washington does own real property (Tacoma

25 Spur Property) located within the Commencement Bay/Nearshore Tideflats Superfund Site

26

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

5

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA 98504-0113
(360) 753-6126   Facsimile: (360) 586-6847

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

(CB/NT Site), neither one is the "facility" for purposes of this action.  The facility for purposes of this action is the Thea Foss and Wheeler Osgood Waterway Problem Areas (Waterways)— the site where the hazardous substances were disposed of and where the cleanup efforts were concentrated.  Since WSDOT has never owned and operated the Waterways, WSDOT is not liable pursuant to § 107(a)(1) or (2) of CERCLA.

### 1.    Establishing liability under CERCLA.

Liability under CERCLA requires that a plaintiff prove four basic elements: (1) there has been a "release" or "threatened release" of "hazardous substances" from a site; (2) the site is a "facility;" (3) the release or threatened release has caused incurrence of "response costs;" and (4) the defendant is one of the kinds of persons who are responsible for the incurrence of those costs.  *Miami-Dade County v. United States*, 345 F. Supp. 2d 1319, 1333 (S.D. Fla. 2004).

To prove the fourth element, a plaintiff must show that the defendant falls under one of the four categories of responsible parties identified in CERCLA § 107(a): (1) current owners and operators of a facility at which there is a release or threatened release of a hazardous substance; (2) persons who owned or operated the facility at the time of a hazardous substance disposal; (3) persons who arranged for disposal or treatment of a hazardous substance at the facility; and (4) persons who selected the facility and transported hazardous substances to it. *Id*.  Correctly identifying the "facility" at issue in a CERCLA action is crucial to determining the correct basis of liability, or if a party is liable at all.

### 2.    Identifying the "facility" for purposes of a CERCLA action.

The "facility" for purposes of a CERCLA action is the place where the hazardous substances were disposed of and where the government concentrated its cleanup efforts. *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.,* 810 F.2d 726 (8th Cir. 1986) (*NEPACCO*).  In *NEPACCO*, the defendant transported 55-gallon drums of excess waste

DEF. WSDOT'S RESPONSE TO UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT RE COAL TAR 3:08-CV-05722-RJB

6

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126    Facsimile:  (360) 586-6847

byproducts from its plant to a farm, where it disposed of them.  As a result, the farm became contaminated.  The United States sought recovery of the costs it incurred to cleanup the farm. The District Court found NEPACCO liable as an owner and operator of a facility pursuant to CERCLA § 107(a)(1).  The Eighth Circuit disagreed, holding that the "facility" is the place where the hazardous substances were disposed of and where the government concentrated its cleanup efforts—in that case, the farm.  Since NEPACCO was not the owner or operator of the farm, the Court reasoned, it was not liable as an owner and operator under CERCLA § 107(a)(1).[4]  *See also ACC Chemical Company v. Halliburton Company*, 932 F. Supp. 233 (S.D. Iowa 1995) (holding that the facility is the place where the hazardous substances were disposed of and where the government has concentrated its cleanup efforts).

The exact issue before this court was addressed in *City of Bangor v. Citizens Communications Company*, No. Civ. 02-183-B-S, 2004 WL 483201 (D. Me. Mar. 11, 2004) (attached).  In that case, the City of Bangor filed a CERCLA action against Citizens to recover costs incurred by the City to cleanup the Penobscot River.  The river was contaminated when tar flowed from a former manufactured gas plant site, through a sewer that passed through other parcels of property, and into the river from a sewer outfall.  Citizens contended that the "facility" for purposes of the lawsuit was not only the river, but also the former gas plant site and the intervening land through which the sewer passed.  The court disagreed, holding that "there appears to be incorporated into § 107(a)(1)'s concept of facility ownership an understanding that *ownership pertains to the facility where response costs are being expended*." *Id.* at *7 (emphasis added).  Pointing out that the City limited its CERCLA action to recover costs associated only with the Penobscot River, the Court held that the "facility" was the river.  Although the former gas plant site and intervening land through which the sewer

---

[4] NEPACCO conceded it was liable as an "arranger" and that finding was not challenged on appeal. Although the United States alleged in its complaint that WSDOT is liable as an "arranger," it has not sought summary judgment on that claim.

7

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

1
2
3
4

passed might meet the definition of "facility," the Court rejected the notion that any facility causally connected to the deposition of hazardous substances at the facility where response costs are being expended should be included.  Therefore, the City's prior ownership of the gas plant site and the sewer did not provide a basis for liability under CERCLA § 107(a)(1).

5
6
7
8
9
10

The facts of *City of Bangor* are nearly identical to the facts in the instant action.  The United States limited its CERCLA action to recover costs associated with the Waterways. Contrary to the holding in *City of Bangor*, the United States wants to include facilities causally connected to the site of the deposition, rather than the facility where the response costs were incurred.  As with the City of Bangor, the State's ownership of the Tacoma Spur Property does not provide a basis for liability under CERCLA § 107(a)(1).

11
12
13
14
15
16
17

In this case, it was the Waterways where the hazardous substance was disposed.  The United States averred this time and time again in its complaint: "[t]he sediments in the *Thea Foss and Wheeler-Osgood Waterways* have been contaminated with hazardous substances, . . . ." Pl.'s Compl. ¶ 18 (emphasis added).  "The releases and threatened releases of hazardous substances at the *Thea Foss and Wheeler Osgood Waterway Problem Areas* caused the United States to incur 'response' costs, . . . ."  Pl.'s Compl. ¶ 51 (emphasis added).[5] Other examples are highlighted at Ex. 6.

18
19
20
21
22
23
24

In addition to being the place where the hazardous substances were disposed of, the Waterways were the place where the United States concentrated its cleanup efforts and incurred the response costs it now seeks to recover:  "[a]s of June 30, 2008 the United States has incurred . . . unreimbursed response costs, . . . in connection with the *Thea Foss and Wheeler Osgood Waterway Problem Areas*."  Pl.'s Compl. ¶ 44 (emphasis added).  "The response action taken and the response costs incurred by the United States and in connection

25
26

[5] Plaintiff's references to the Thea Foss and Wheeler Osgood Waterways as the location where response costs were incurred can be found at ¶¶ 1, 15, 16, 17, 18, 19, 20, 22, 35, 36, 38, 40, 43, 44, 45, 50, 51, 52, 55, 56, and 57; as well as in ¶¶ 1 and 2 of its Prayer for Relief.

DEF. WSDOT'S RESPONSE TO UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT RE COAL TAR 3:08-CV-05722-RJB

8

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

with the *Thea Foss and Wheeler Osgood Waterway Problem Areas* are not inconsistent with the National Contingency Plan." Pl.'s Compl. ¶ 52. Other examples are highlighted at Ex. 6.

It is clear from the facts alleged by the United States that it is the Waterways where the hazardous substance was disposed of and where the government concentrated its cleanup efforts. Accordingly, the "facility" in this action is the Thea Foss and Wheeler Osgood Waterway Problem Areas.

### 3. The "facility" is not the Tacoma Spur Property or the CB/NT Superfund Site.

Although the Tacoma Spur Property meets the definition of "facility" in CERCLA § 101(9), it is not the facility at issue in this lawsuit. The United States did not concentrate any cleanup efforts or incur any response costs with regard to the Tacoma Spur Property. Rather, WSDOT did that on its own. "In 1986, WSDOT initiated its own cleanup at the Tacoma Spur Property . . . ." Pl.'s Compl. ¶ 28. Had the United States incurred response costs to cleanup the Tacoma Spur Property, it could attempt to recover those costs from WSDOT pursuant to § 107(a)(1) and/or (a)(2). However, the United States seeks to recover costs incurred to cleanup the Waterways. Accordingly, the United States cannot claim that the Tacoma Spur Property is the "facility" for purposes of this action.

The CB/NT Site is also not the facility for purposes of this action. The United States cited to several cases to support the proposition that a "facility" can be a larger site even though contamination took place in a section of that larger site. However, none of the cases cited support the United States' position that the facility is the entire CB/NT Site. Two of the cases involved a parcel of property that was treated as one facility because the contamination (and cleanup) was spread throughout the entire site. Another case involved three parcels of property that were treated as one facility because they were conveyed together and owned by the same people. Those facts are not present here and do not support the contention that the

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

9

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

1   CB/NT Site, which is 10-12 square miles in size, made up of properties with different owners,
2   and only a portion of which was contaminated, is the "facility."

3   One of the cases cited by the United States recognized that an area should be defined as
4   a single "facility," even if it contains parts that are non-contaminated, *only* if it cannot be
5   reasonably or naturally divided into multiple parts or functional units. *United States v.*
6   *Township of Brighton*, 153 F.3d 307, 313 (6th Cir. 1998). But the United States has already
7   acknowledged that the CB/NT Site <u>can</u> be reasonably and naturally divided into multiple parts
8   and functional units. In its own Record of Decision (ROD), the United States identified eight
9   problem areas in the CB/NT Site. Three of them—the head of Thea Foss Waterway, the mouth
10  of the Thea Foss Waterway, and the Wheeler Osgood Waterway, comprise the Thea Foss and
11  Wheeler Osgood Waterway Problem Areas referred to in the United States' Complaint. Pl.'s
12  Compl. ¶ 15.

13  Courts addressing the issue of what the "facility" is have relied on whether the
14  contaminated property in question is part of the same operation. One district court concluded:

16  > This court concludes that usually, although perhaps not always, the definition of
    > facility will be the entire site or area, including single or contiguous properties,
17  > *where hazardous wastes have been deposited as part of the same operation or*
    > *management.*

18  *Cytec Industries, Inc. v. B.F. Goodrich Co.,* 232 F. Supp. 2d 821, 836 (S.D. Ohio 2002)
19  (emphasis added). In that case, the property was owned and operated by the same company as
20  a single facility, as it had been by its predecessors. *Id.* at 837. *See also Sierra Club v.*
21  *Seaboard Farms, Inc.,* 387 F.3d 1167, 1174-75 (10th Cir. 2004) (entire farm owned by single
22  owner was one facility). In another case, citing to *Cytec,* the court acknowledged that the
23  designation of a city sewer system as a facility separate from the privately-owned
24  contaminated area was appropriate. *Adobe Lumber, Inc. v. Hellman,* 658 F. Supp. 2d 1188,
25  1202 (E.D. Cal. 2009). In the present case, there is no dispute that the Tacoma Spur Property

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

10

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA 98504-0113
(360) 753-6126   Facsimile: (360) 586-6847

is not contiguous to the waterway, and it is not part of the same "operation or management" as the waterway.

The facility for purposes of this lawsuit is the Thea Foss and Wheeler Osgood Waterway Problem Areas. Since WSDOT has never owned or operated that facility, it cannot, as a matter of law, be held liable pursuant to CERCLA § 107(a)(1) or (2).

**C.      The State of Washington is the Property Owner**

Even if the highway property were the facility, WSDOT is not the record owner of the highway property. RCW 47.12.010 authorizes WSDOT to acquire property in the name of the State of Washington. The deed for part of the gas plant property, included with the United States' motion as Exhibit 6, states that the property is being conveyed to the State of Washington. The United States has failed to explain how any statements to the contrary undermine the effectiveness of either the state statute or the deed.

**D.      Operation of the French Drain for the Purpose of Removing Groundwater Does Not Make WSDOT an "Operator"**

Even if the highway property were the facility, WSDOT is not the operator for purposes of CERCLA. In *Redevelopment Agency of City of Stockton v. Burlington Northern and Santa Fe Railway Corporation,* the court held that having installed a French drain that was later infiltrated by someone else's pollution did not make the railroad an "operator." No. Civ. S-05-02087, 2007 WL 1793755 (E.D. Cal. June 19, 2007). The railroad designed the French drain system to be built under new tracks because groundwater would have damaged the tracks. After the railroad began using the tracks, oil was spilled at a nearby petroleum facility, and moved through groundwater infiltrating the French drain.

To determine whether the railroad was an operator, the court looked at the test set out in *United States v. Bestfoods,* which held that an operator "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

11

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Clearwater Drive SW
PO BOX 40113
Olympia, WA 98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

disposal of hazardous waste, or decisions about compliance with environmental regulations."

524 U.S. 51, 66-67, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998).  The court concluded that:

> The perforated french drain never was intended to serve as a conduit for hazardous materials, nor, to the extent that they may have operated it in a general sense, did the Railroads do so for a purpose related to pollution.

*City of Stockton,* at *5.  The railroads were therefore not operators.  Likewise in this case, there can be no dispute that the French drain was installed to remove groundwater, and never was intended to serve as a conduit for hazardous materials.  WSDOT spent millions of dollars removing hazardous materials, including coal tar, from this site before constructing South A Street or the drain systems, and documented that cleanup process.  The documentation also establishes that the purpose of the French drain was to remove groundwater and prevent it from damaging the street.  Ex. 1, at 786:5-17.  Uncontroverted evidence establishes that the drain system was installed in clean soil, and that it was later infiltrated by contamination that WSDOT did not cause in the first place.  These facts support the conclusion that WSDOT is not an operator.

**E.     The State Court Judgment in *PacifiCorp and Puget Sound Energy* Should Not Be Given Collateral Estoppel Effect**

The United States asks this court to preclude WSDOT from litigating CERCLA owner and operator liability for the purported releases from the South A Street drains, claiming that a prior Washington State judgment has already resolved this purely federal issue.  The United States fails to justify what would be a nonmutual offensive application of collateral estoppel under either federal law or Washington State law.  Federal law allows such application only when the risk of unfairness is eliminated and then only if it would be given preclusive effect under state law.  Washington law may not authorize it at all, but if it does, using it here violates Washington's collateral estoppel test.

DEF. WSDOT'S RESPONSE TO UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT RE COAL TAR 3:08-CV-05722-RJB

12

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Traditionally, collateral estoppel operated to protect a defendant from relitigating in a second trial an issue identical to an issue that defendant already won, after fully litigating to a final decision, during a first trial with the same plaintiff.  It could be used to defend, not establish, claims, and could be used only when there was mutuality—when both parties to the current suit were also parties to the first.  The doctrine's purpose was to avoid the time and expense of an unnecessary full second trial between the same parties for both the court and the defendant (who cannot choose whether or where to litigate).  *See, e.g., Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326-27, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979).[6]

Only a party to the first case can be collaterally estopped because making a judgment binding on a non-party violates due process.  *Parklane Hosiery*, 439 U.S. at 327, 327 n.7.  Nonmutual collateral estoppel therefore allows a non-party to the first lawsuit to preclude opposing parties from litigating issues in the second lawsuit, but that non-party is not itself precluded from litigating any issue.  *Parklane Hosiery*, 439 U.S. at 327.  In addition to this inherent unfairness, allowing nonmutual offensive use is also unfair when the earlier judgment is inconsistent or when the second lawsuit provides previously unavailable procedural opportunities that could cause a different result.  *Parklane Hosiery*, 439 U.S. at 330-31.  Moreover, nonmutual offensive use defeats the doctrine's purpose, by necessarily increasing, rather than decreasing, trials.  *Parklane Hosiery*, 439 U.S. at 329-30 ("a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, . . . .").  Federal courts thus allow nonmutual offensive use only when it would not be unfair to the current defendant.  *Parklane Hosiery*, 439 U.S. at 331.

---

[6] The United States would have a stronger claim to judicial economy if it had raised its collateral estoppel argument when discovery began, rather than after the parties have completed all written (and most oral) discovery, including the exchange of expert reports.  *See United States v. American Cyanamid Co.*, 794 F. Supp. 61, 62, 64 n.4 (D.R.I. 1990).  Completing discovery before seeking to preclude litigation defeats the purpose of collateral estoppel.  *Id.* at 64 n.4.

DEF. WSDOT'S RESPONSE TO UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT RE COAL TAR 3:08-CV-05722-RJB

13

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA 98504-0113
(360) 753-6126   Facsimile: (360) 586-6847

Under *Parklane Hosiery*, this court should refuse to allow the requested nonmutual offensive use of collateral estoppel because doing so would be unfair to WSDOT.  The United States was not a party to and is not bound by any part of the state court Model Toxics Control Act (MTCA) judgment.  But the state court also reached liability decisions that, if given complete preclusive effect, would eliminate entire theories of liability urged by the United States.  At summary judgment, the state court determined that WSDOT was not liable as an owner for any release, and was not liable for any releases of highway stormwater runoff.  Ex. 8.  The United States now demands that this court preclude relitigation of issues that favor its position in the current case while allowing relitigation of issues that would otherwise prevent or limit recovery by the United States.  This defeats judicial economy; there will be more, not less, litigation as the United States pursues the rulings it prefers in this court.[7]  It is also completely unfair to preclude WSDOT from federally litigating an issue similar to one it lost in state court and, at the same time, to require WSDOT to federally litigate two significant issues similar to ones it won in state court.

Other than the threshold *Parklane Hosiery* determination, state law must determine whether a state court ruling has preclusive effect.  Under 28 U.S.C. § 1738, this "federal court must give the same preclusive effect to a state-court judgment as another court of that State would give."  *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523, 106 S. Ct. 768, 88 L. Ed. 2d 877 (1986).  The United States does not meet Washington State's four-part collateral estoppel test.

Under Washington law, it is far from clear that nonmutual offensive collateral estoppel is generally permitted.  There is no Washington State version of *Parklane Hosiery*.  In 1967, the Washington Supreme Court acknowledged that some courts had eliminated existing limits on collateral estoppel and that there could be Washington cases where it would be appropriate

---

[7] The United States recently sought, and obtained, summary judgment declaring WSDOT liable under CERCLA for its highway stormwater runoff; the state trial court reached an opposite decision under MTCA.

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

14

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126    Facsimile:  (360) 586-6847

to do so.  *Henderson v. Bardahl International Corp.*, 72 Wn.2d 109, 116, 431 P.2d 961 (1967). But although the *Henderson* plaintiff sought to apply nonmutual offensive collateral estoppel, the *Henderson* court made no definitive holding, instead declaring it "unnecessary to consider those issues in the present case, intriguing as they may be, . . . ."  *Id.*  It then rejected collateral estoppel for other reasons, including injustice to the defendant.  *Henderson,* 72 Wn.2d at 116-19.

Later cases have taken a similar course, declining to make any definitive holding authorizing nonmutual[8] offensive collateral estoppel, while generally rejecting specific requests for it.  *See, e.g., Hadley v. Maxwell*, 144 Wn.2d 306, 27 P.3d 600 (2001) (unjust); *Yakima Cement Prod. Co. v. Great Am. Ins. Co.*, 14 Wn. App. 557, 544 P.2d 763 (1975); *but see United Pac. Ins. Co. v. Boyd*, 34 Wn. App. 372, 661 P.2d 987 (1983).[9]  In contrast, the general prohibition on nonmutual *defensive* collateral estoppel has been definitively removed. *Nielson v. Spanaway Gen. Med. Clinic, Inc.*, 85 Wn. App. 249, 253, 931 P.2d 931 (1997), *aff'd*, 135 Wn.2d 255, 956 P.2d 312 (1998); *Dunlap v. Wild*, 22 Wn. App. 583, 589, 591 P.2d 834 (1979).  And the apparently nonmutual offensive preclusive use of certain administrative decisions actually involves parties in privity.[10]  Without clear Washington Supreme Court authorization, Washington law does not allow the United States to use nonmutual offensive collateral estoppel in the current case.

If Washington State law did allow this use, then the party asserting the doctrine bears the burden of proving that precluding litigation would meet Washington's four-part test.

---

[8] Cases allowing offensive but *mutual* use include *King v. City of Seattle*, 84 Wn.2d 239, 525 P.2d 228 (1974) *overruled on other grounds City of Seattle v. Blume,* 134 Wn.2d 243 (1997); *Am. Linen Supply Co. v. Nursing Home Bldg. Corp.*, 15 Wn. App. 757, 766, 551 P.2d 1038 (1976).

[9] *Boyd* is a state court of appeals decision apparently allowing nonmutual offensive use without saying so.  It cites only to a case allowing *mutual* use.  As the *Boyd* plaintiff had tried to intervene, there may have been some mutuality.  In any event, *Boyd* cannot change the common law set by the Washington State Supreme Court.

[10] *See Henderson v. Bardahl International Corp.*, 72 Wn.2d 109, 116 n.12, 431 P.2d 961 (1967) (referencing cases); *Bordeaux v. Ingersoll Rand Co.*, 71 Wn.2d 392, 398-99, 429 P.2d 207 (1967) (explaining the parties are in privity).

DEF. WSDOT'S RESPONSE TO UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT RE COAL TAR 3:08-CV-05722-RJB

15

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA 98504-0113
(360) 753-6126   Facsimile: (360) 586-6847

*Nielson v. Spanaway Gen. Med. Clinic, Inc.*, 135 Wn.2d 255, 262-63, 956 P.2d 312 (1998). Thus, the United States must prove that (1) the issues are identical; (2) the first decision was a final judgment on the merits;[11] (3) the party to be bound must have been a party to the prior adjudication; and (4) applying the doctrine would not be unjust to the party to be bound. *Hadley*, 144 Wn.2d at 311.  Here, the United States cannot prove the first or fourth factors.

The issue in the second case must be truly identical, not merely similar; it must also have been necessary and material to the first court's decision.  *See, e.g., Henderson*, 72 Wn.2d at 118; *Seattle-First Nat'l Bank v. Cannon*, 26 Wn. App. 922, 928, 615 P.2d 1316 (1980) (prior criminal trial established fact of theft but not exact amount stolen); *Hale v. City of Seattle*, 48 Wn. App. 451, 455-57, 739 P.2d 723 (1987) (finding that statute lacks rational basis under state constitution does not preclude litigating whether the statute lacks rational basis under federal constitution).  Although similar, the issue decided in the state court MTCA action is not the same issue before the court in this federal CERCLA action.

The plaintiffs in the state court MTCA action argued WSDOT was liable for South A Street drain releases as an owner, an operator, and arranger.  The state court held WSDOT was not liable as an owner.  The summary judgment and the trial judgment are therefore based on some combination of operator and arranger liability.  It is impossible, however, to determine to what extent the state court's decision is based on which theory of liability.  Exs. 8 and 9.  Given the facts, the state determination is more likely a finding that WSDOT arranged to dispose in the waterway, rather than operating a facility at which the disposal took place, as the plaintiffs also sought damages solely for releases to the waterway itself.

---

[11] WSDOT recognizes that its appeal of the state court judgment does not defeat factor two. *See Nielson*, 135 Wn.2d at 264.  But WSDOT's appeal is a reason for this court to make the prior decision more preclusive. *King*, 84 Wn.2d at 243.  Second, if reversed on appeal, the first decision will lose its preclusive effect. *Lejeune v. Clallam County*, 64 Wn. App. 257, 266, 823 P.2d 1144 (1992).  Third, WSDOT would be able to attack and vacate this court's judgment if it is based on the preclusive effect of the reversed state court judgment. *Fahlen v. Mounsey*, 46 Wn. App. 45, 47, 49-50, 728 P.2d 1097 (1986).

DEF. WSDOT'S RESPONSE TO UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT RE COAL TAR 3:08-CV-05722-RJB

16

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

In the current federal case, the United States seeks summary judgment that WSDOT is liable as an owner and an operator.  The United States does not argue for summary judgment on arranger liability.  Even assuming that MTCA's and CERCLA's liability standards are identical, the state court did not decide the same issue that is now before this court.  The prior decision cannot preclude litigation on an ownership theory, as WSDOT prevailed on that issue. The prior decision does not preclude litigation of operator liability, as it is not clear to what extent the state court decision depends on arranger, as opposed to operator, liability.  When it is not certain that the issue was previously litigated, there is simply no preclusive effect. *Davis v. Nielson*, 9 Wn. App. 864, 874-75, 515 P.2d 995 (1973).

Moreover, the law regarding arranger liability changed significantly *after* the state court determined WSDOT was liable as an arranger.  In *Burlington Northern and Santa Fe Railway Co. v. United States*, 556 U.S. ___, 129 S. Ct. 1870, 1878-80, 173 L. Ed. 2d 812 (2009), the United States Supreme Court narrowed the scope of arranger liability and added an objective intent element.  When the state court ruled, it was significantly easier to find WSDOT liable as an arranger.  This again suggests the trial court determined a different issue (arranger liability) than the issue before this court (owner and operator liability).  When the law governing the first decision changes or is different than the law governing the second decision, then the first issue is not the same and has no preclusive effect.  *See Friends of the Earth v. Hall*, 693 F. Supp. 904, 920 (W.D. Wash. 1988) (applying Washington law).

The first judgment must be unambiguous and consistent; otherwise, the issues are not identical and the judgment has no preclusive effect.  *See, e.g., Henderson*, 72 Wn.2d at 116-18; *Friends of the Earth*, 693 F. Supp. at 920.  The state court decisions are materially ambiguous and inconsistent.  The state court findings recite that WSDOT is liable as an owner, contradicting its earlier holding.  The state court found WSDOT's expert more credible, yet adopted findings contrary to his testimony.  When it held WSDOT liable for a release of some

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

17

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

size at summary judgment, the state court indicated it would not allocate costs to WSDOT unless the plaintiffs proved WSDOT's release actually caused them.  But, despite finding that it could not determine any amount of materials released, the State court awarded $6 million in costs to plaintiffs, essentially on the same bare finding of liability determined at summary judgment.  These and other inconsistencies are detailed in WSDOT's appellate brief.  Ex. 10.  This court cannot give preclusive effect to the ambiguous and inconsistent state court judgment.

This court also cannot give preclusive effect to the earlier judgment if doing so would be unjust to WSDOT.  And here it would be, because that prior judgment is simply wrong.  *See Henderson*, 72 Wn.2d at 118-19.  While most jurisdictions do not probe beneath the surface of the prior decision, under Washington law, when a material finding is erroneous, then it is unjust to give that finding preclusive effect.  *Id.*  In its appeal, WSDOT assigned error to many material factual findings.  Ex. 10.  Before this court can preclude litigation, Washington law requires it to examine the accuracy of the findings that WSDOT disputes.[12]  WSDOT urges that all the erroneous findings are a basis to reject collateral estoppel.  Of particular significance, however, the state court found that WSDOT had released hazardous materials to the waterway sediments even though the only competent testimony based on a scientific analysis of the nature and composition of those sediments concluded the source was stormwater.  A direct contradiction between a finding and testimony led the *Henderson* court to reject preclusive effect.  72 Wn.2d at 119.

Under Washington law, it is also unjust to use collateral estoppel to preclude relitigation of an important public question.  *Kennedy v. City of Seattle*, 94 Wn.2d 376, 378-79, 617 P.2d 713 (1980).  The liability of Washington taxpayers for pollution abandoned by private entities so that it invades public safety structures is just such an issue.

---

[12] Again, this is a reason why the court may wish to exercise its discretion by rejecting collateral estoppel while WSDOT's appeal is pending.

DEF. WSDOT'S RESPONSE TO UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT RE COAL TAR 3:08-CV-05722-RJB

18

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

The United States Supreme Court limited the reach of *Parklane Hosiery* when it held that nonmutual offensive collateral estoppel could not be used against the government.  *United States v. Mendoza*, 464 U.S. 154, 158, 162, 163-64, 104 S. Ct. 568, 78 L. Ed. 2d 379 (1984).  In *Mendoza*, the particular government was the United States.  But the Court's rationale applies equally to Washington State.  Like the United States, Washington constantly litigates recurring issues of substantial public importance in multiple courts.  Allowing preclusive effect would force Washington State to appeal every case.  Moreover, Washington State's executive branch, like the United States' executive branch, must be free to make different policy decisions in response to elections.

Here, Washington State executives and agencies must be free to make different and evolving policy decisions about how to respond to claimed responsibility for hazardous waste contamination.  A court decision regarding one such decision should not preclude future litigation with new parties.  Moreover, the legal standards for allocation or apportionment were very much disputed in the first case, remain disputed on appeal, and are again disputed in this case.  Washington State should not be limited to just one adjudication regarding these important legal standards.  Nor should its taxpayers be forever required to pay every claim for pollution in public structures because of a single state court case.

The United States incorrectly argues that *Mendoza* is limited to federal constitutional issues and has no application to factual findings.  Collateral estoppel always applies to factual determinations, not pure questions of law.  And the *Mendoza* court rejected the claimed limitation by specifying that "our holding in no way depends on" the collateral estoppel exception for unmixed questions of law arising in successive cases.  464 U.S. at 573 n.7.

Washington State has not yet decided whether *Mendoza* protects state agencies from application of nonmutual offensive collateral estoppel.  *City of Seattle v. Visio*, 108 Wn. App.

DEF. WSDOT'S RESPONSE TO UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT RE COAL TAR 3:08-CV-05722-RJB

19

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

566, 574-77, 31 P.3d 740 (2001).[13]   But two earlier decisions hold that collateral estoppel should not be used to preclude relitigation of important issues, especially public issues. *Southcenter Joint Venture v. Nat'l Democratic Policy Comm.*, 113 Wn.2d 413, 419, 780 P.2d 1282 (1989); *Kennedy*, 94 Wn.2d at 378-79.   Those decisions protect the same interests and support full application of *Mendoza* to cases in which the State of Washington is a party.

**F.     Whether the South A Street Drain System Had Any Impact on Thea Foss Sediment PAH Levels is an Issue of Fact and Not Appropriate for Summary Judgment**

In this case, both the South A Street site and the Waterway sediments have PAH contamination.   The United States contends that the South A Street drains were the cause of this surface sediment contamination.   However, WSDOT has submitted evidence that the PAH in the waterway resulted from urban stormwater runoff, and not from coal tar.   Where there is specific evidence that the contaminants in the two locations are in fact different, that presents a factual issue for trial.

WSDOT has retained Helder Costa, a chemist who has worked at many manufactured gas plant (MGP) sites, as an expert witness.   To determine whether the South A Street drains had any impact on sediment quality, Mr. Costa looked at: (1) temporal trends in PAH levels throughout the Thea Foss and other waterways; and (2) the ratios of several pairs of PAHs, which have different ranges for different sources of contamination such as coal tar and stormwater, and may be used to determine if a particular material was a source of contamination.   Based on this evidence, Mr. Costa concluded that the increase in PAH concentrations that were observed in Thea Foss between about 1986 and about 1996 were due to increased PAH concentration in stormwater, and not to a source of coal tar.   Costa Decl., Ex. 1, at 17.

---

[13] *Visio* refused to decide the larger question, affirming the application of collateral estoppel against a city department for other reasons.

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126    Facsimile:  (360) 586-6847

1.   **The "temporal trends" do not support a conclusion that the PAH came from coal tar; rather, they indicate that it came from stormwater.**

There was PAH contamination in the Waterway long before the South A Street drains were built in 1986.  The only question is whether these drains contributed to an increase in the concentration of PAH after they were constructed.  There were sediment samples taken prior to drain construction (1984-86) as well as after (1994-96), and "core samples" that include sediment deposited many years prior to the drains' construction as well as after.

The cores were radioactively dated so that the date of each layer of sediment could be approximated.  Mr. Costa found that these showed PAH concentrations increasing over time throughout much of the waterway.  Costa Decl., Ex. 1, at 8-9 and Figure 4.  Mr. Costa also referred to a study by the United States Geological Survey (USGS) on several lakes around the country in which the authors concluded that higher sediment PAH levels correlated with increases in population and traffic and were the result of urban growth.  Costa Decl., Ex. 1, at 7; Ex. 5.  This study included Lake Ballinger just north of Seattle.  The Lake Ballinger PAH concentration increased at a similar rate to that of Thea Foss over approximately the same time frame.  Pierce and Snohomish Counties had similar population growth rates during this time period.  *See* Costa Decl., Ex. 1, at 6-8 and Figures 5 and 6.  Mr. Costa saw the same increase and decrease in the sediment core samples throughout Thea Foss, and also in the core samples in the Lake Ballinger USGS study.  Mr. Costa concluded that this was a regional effect, possibly caused by increased traffic or woodstove use.  As such, it does not support a conclusion that the coal tar in the South A Street drains was the cause of an increase in PAH contamination in the Thea Foss Waterway.

2.   **Forensic analysis supports the conclusion that the source of increased PAH in sediment came from stormwater runoff and not coal tar.**

PAHs are a group of compounds that occur in different proportions to one another depending on their source.  Mr. Costa looked at several ratios: (1) for coal tar material from the South A Street catch basins, (2) for recent sediment that is only stormwater-affected, and (3)

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

21

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

1
2
3
4

for 1984-2003 samples from the waterway and near the West Twin outfall.  If coal tar from South A Street was reaching the waterway in an amount that could be detected in sediment, the mid-1990s samples should have shown ratios consistent with the known coal tar samples. However, their ratios were consistent with the ratios for stormwater, not coal tar.

5
6
7
8
9
10
11
12
13

Mr. Costa looked first at samples from the "migration pathway," or the pipes through which coal tar contamination would have to have traveled to get to the waterway.  He found that the ratios of these sediment trap samples were closer to the ratio for stormwater than for coal tar and did not support a conclusion that coal tar contributed to the PAH concentration level.  Costa Decl., Ex. 1, at 12-14 (Figure 10).  He next looked at the waterway sediment core samples, the "receiving environment," and reached the same conclusion.  Costa Decl., Ex. 1, at 14-16 (Figures 12-17).  Mr. Costa concluded that the forensic analysis of these cores indicated that they were impacted by stormwater, which is affected by airborne contaminants such as wood smoke.  Costa Decl., Ex. 1, at 7; *see also* Costa Decl., Ex. 1 (Figures 4-6).[14]

14
15
16
17
18
19

This is further corroborated by the report of WSDOT's air quality expert, Kirk Winges, who also concluded that changes in airborne contaminant levels could account for the variability in the sediment samples.  Mr. Winges also noted a correlation between levels of wood stove use, which increased dramatically in the 1980s, and the variability seen in the core samples.  Winges Decl., Ex. 1 (Figure 6).  Wood stoves are a significant source of atmospheric PAH.  Winges Decl., Ex. 1, at 13-14.

20
21
22

This evidence demonstrates that the increase in waterway contamination that the United States ascribes to the drain system was more likely than not caused by a regional increase in

23
24
25
26

[14] Mr. Costa's report responds to an expert report produced by the United States in which the United States' expert concludes that the coal tar from the South A Street drains resulted in higher PAH concentrations in the Waterway.  Costa Decl., Ex. 1, at 6 and 12.  Mr. Costa noted that the United States' expert used the phenanthrene to anthracene ratio in his report.  Costa Decl., Ex. 1, at 11.  Mr. Costa included that ratio in his report for that reason, but noted that this ratio does not distinguish between the coal tar source and stormwater, which is precisely the distinction that is needed from this analysis.  *See* Costa Decl., Ex. 1 at Table 3.

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

22

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

stormwater contamination, and precludes summary judgment for the United States on this issue.

**G.    Contamination at the South A Street Site Resulted from the Actions of Third Parties Over Whom WSDOT Had No Control, and WSDOT Handled the Material With Due Care**

The United States contends that WSDOT is not entitled to the third party defense, including the defense that the coal tar migrated from other contiguous property into the French drain and storm drain.  There is no dispute that WSDOT did not operate the manufactured gas plant, generate the coal tar waste found on the gas plant site, or dispose of the coal tar.  There is no evidence that all contamination was not removed from the South A Street construction site, and that the drains were not installed in clean soil.  The United States' contention is that WSDOT did not handle the material with due care.

WSDOT handled the coal tar left behind by the gas plant with due care.  WSDOT worked closely with the Department of Ecology to conduct a cleanup of the site during SR 705 construction; there is no assertion or any evidence that this was not done with due care.  The only assertion is that WSDOT did not cleanup the entire area where the gas plant wastes could have been located; however, WSDOT would have had authority to work only on the property acquired by the State for the highway, and not on adjacent private property.

The United States relies on documentation of testing conducted in the South A Street drains in 1989 to show that WSDOT "knew" that coal tar was getting into the drain system.  However, nothing in the United States' Exhibit 41 references coal tar, and WSDOT's consultants certainly would have pointed it out had they observed coal tar.

The United States' assertion that WSDOT took 14 years to solve the South A Street drain problem ignores the work done and the expense WSDOT incurred trying to eliminate the contamination problem and keep South A Street open to traffic.  The evidence shows that WSDOT worked with the Department of Ecology and the City of Tacoma, and cooperated in

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

23

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126    Facsimile:  (360) 586-6847

trying to develop a permanent solution that would allow the street to remain open.  WSDOT took sequential steps to remedy the drain problems, under Ecology's direction.  WSDOT's regional environmental manager, Jeff Sawyer, worked with Ecology's site manager and with the City's stormwater manager during this time.  Mr. Sawyer's declaration sets out his efforts to coordinate with the City stormwater manager regarding the South A Street drains, and to keep EPA, Ecology, and other parties informed through the City's stormwater manager. Contrary to the United States' assertions, Mr. Sawyer was never invited to these meetings by the EPA, but rather only by the City stormwater manager, and generally only the day before the meetings occurred.  Balancing numerous other responsibilities, Mr. Sawyer did his best to provide EPA and the other parties the information that they were seeking.  At no time did Ecology direct WSDOT to do anything differently, up to the point in early 2003 when it demanded that WSDOT abandon all plans of trying to keep the street open and cut off the storm drain.  There is no evidence sufficient to justify dismissing WSDOT's third party defense.  At a minimum, WSDOT's degree of cooperation presents a factual issue for trial in light of Mr. Sawyer's declaration.

## IV.   CONCLUSION

For the foregoing reasons, defendant WSDOT requests that the court deny the United States' motion for partial summary judgment on liability for coal tar releases.

DATED June 14, 2010.

ROBERT M. MCKENNA
Attorney General

/s/ Deborah L. Cade
DEBORAH L. CADE, WSBA# 18329
IAN A. NORTHRIP, WSBA# 21105
AMANDA G. PHILY, WSBA#36776
Assistant Attorneys General
Phone: (360) 753-4964
Email: deborahc@atg.wa.gov
Attorneys for Defendant

DEF. WSDOT'S RESPONSE TO UNITED
STATES' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE COAL TAR
3:08-CV-05722-RJB

24

ATTORNEY GENERAL OF WASHINGTON
Transportation & Public Construction Division
7141 Cleanwater Drive SW
PO BOX 40113
Olympia, WA  98504-0113
(360) 753-6126   Facsimile:  (360) 586-6847

Westlaw

Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
**(Cite as: 2004 WL 483201 (D.Me.))**

H

Only the Westlaw citation is currently available.

United States District Court,
D. Maine.
CITY OF BANGOR, Plaintiff,
v.
CITIZENS COMMUNICATIONS COMPANY, De-
fendant and Third-Party Plaintiff,
v.
BARRETT PAVING MATERIALS, INC., et al.,
Third-Party Defendants
**No. Civ. 02-183-B-S.**

March 11, 2004.
represented by W. Scott Laseter, McKenna, Long &
Aldridge, Atlanta, GA, Lead Attorney, Attorney to be
Noticed, William B. Devoe, Eaton Peabody, Bangor,
ME, Lead Attorney, Attorney to be Noticed, P. And-
rew Hamilton, Eaton Peabody, Bangor, ME, for
Bangor, City of, Plaintiff.

represented by Jay C. Johnson, Mayer, Brown, Rowe
& Maw, Washington, DC, Lead Attorney, Attorney to
be Noticed, Martha C. Gaythwaite, Friedman,
Gaythwaite, Wolf & Leavitt, Portland, ME, Lead
Attorney, Attorney to be Noticed, Bruce W. Hepler,
Friedman, Gaythwaite, Wolf & Leavitt, Portland, ME,
Attorney to be Noticed, John S. Hahn, Mayer, Brown,
Rowe & Maw, Washington, DC, Julie Anna Potts,
Mayer, Brown, Rowe & Maw, Washington, DC, for
Citizens Communications Company, Defendant.

represented by Martha C. Gaythwaite, Lead Attorney,
Attorney to be Noticed, Bruce W. Hepler, Attorney to
be Noticed, John S. Hahn, Julie Anna Potts, (See
above for address), for Citizens Communications
Company, Counter Claimant.

represented by William B. Devoe, Lead Attorney,
Attorney to be Noticed, P. Andrew Hamilton, (See
above for address), for Bangor, City of, Counter De-
fendant.

represented by Martha C. Gaythwaite, Lead Attorney,
Attorney to be Noticed, Bruce W. Hepler, Attorney to
be Noticed, John S. Hahn, Julie Anna Potts, (See

above for address), for Citizens Communications
Company, ThirdParty Plaintiff.

represented by John P. McVeigh, Preti, Flaherty,
Beliveau, Pachios & Haley, LLC, Portland, ME, Lead
Attorney, Attorney to be Noticed, David B. Van
Slyke, Preti, Flaherty, Beliveau, Pachios & Haley,
LLC, Portland, ME, Attorney to be Noticed, for Bar-
rett Paving Materials Inc, ThirdParty Defendant.

represented by John S. Hahn, (See above for address),
for Citizens Communications Company, ThirdParty
Plaintiff.

represented by John H. De Yampert, Jr., U.S. De-
partment of Justice, Torts Branch, Civil Division,
Washington, DC, Lead Attorney, Stephen E. Crowley,
U.S. Department of Justice, Environmental & Natural
Resources Division, Environmental Defense Section,
Washington, DC, Lead Attorney, Attorney to be No-
ticed, Michelle T. Delemarre, U.S. Department of
Justice, Washington, DC, Attorney to be Noticed, for
United States Army Corps of Engineers, ThirdParty
Defendant.

represented by John S. Hahn, (See above for address),
for Citizens Communications Company, ThirdParty
Plaintiff.

represented by Frederick F. Costlow, Richardson,
Whitman, Large & Badger, Bangor, ME, Attorney to
be Noticed, Mary F. Kellogg, Richardson, Whitman,
Large & Badger, Bangor, ME, Frederick J. Badger,
Jr., (See above for address), Attorney to be Noticed,
for Guilford Transportation Industries, Inc, ThirdParty
Defendant.

represented by John S. Hahn, (See above for address),
for Citizens Communications Company, ThirdParty
Plaintiff.

represented by Francis G. Kelleher, Goodwin, Proctor
& Hoar, Boston, MA, Lead Attorney, Attorney to be
Noticed, Gregory A. Bibler, Goodwin Proctor LLP,
Boston, MA, Lead Attorney, Attorney to be Noticed,
Sean Mahoney, Verrill & Dana, Portland, ME, Lead
Attorney, Attorney to be Noticed, Robert L. Brennan,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
(Cite as: 2004 WL 483201 (D.Me.))

Goodwin Proctor LLP, Boston, MA, Attorney to be Noticed, for Honeywell International Inc, ThirdParty Defendant.

represented by John S. Hahn, (See above for address), for Citizens Communications Company, ThirdParty Plaintiff.

represented by Charles A. Harvey, Jr., Harvey & Frank, Portland, ME, Lead Attorney, Attorney to be Noticed, Robert S. Frank, Harvey & Frank, Portland, ME, Attorney to be Noticed, for Dead River Company, ThirdParty Defendant.

represented by John S. Hahn, (See above for address), for Citizens Communications Company, ThirdParty Plaintiff.

represented by John S. Hahn, (See above for address), for Citizens Communications Company, ThirdParty Plaintiff.

represented by Douglas A. Grauel, Nelson, Kinder, Mosseau & Saturley, P.C., Manchester, NH, Lead Attorney, Attorney to be Noticed, Jay Varon, Foley & Lardner, Washington, DC, Lead Attorney, Attorney to be Noticed, Bradley D. Holt, Nelson, Kinder, Mosseau & Saturley, P.C., Manchester, NH, E. Tupper Kinder, Nelson, Kinder, Mosseau & Saturley, P.C., Manchester, NH, for UGI Utilities Inc, ThirdParty Defendant.

represented by John S. Hahn, (See above for address), for Citizens Communications Company, ThirdParty Plaintiff.

represented by John S. Hahn, (See above for address), for Citizens Communications Company, ThirdParty Plaintiff.

represented by Jeffrey A. Thaler, Bernstein, Shur, Sawyer, & Nelson, Portland, ME, Lead Attorney, Attorney to be Noticed, for Beazer East Inc, ThirdParty Defendant.

represented by John S. Hahn, (See above for address), for Citizens Communications Company, ThirdParty Plaintiff.

represented by Charles T. Wehland, Jones, Day, Chicago, IL, Lead Attorney, Attorney to be Noticed, David S. Sherman, Jr, Drummond, Woodsum & MacMahon, Portland, ME, Lead Attorney, Attorney to be Noticed, Albert D. Sturtevant, Laura M. Earl, Jones, Day, Chicago, IL, Attorney to be Noticed, for Centerpoint Energy Resources Corp, ThirdParty Defendant.

represented by John S. Hahn, Julie Anna Potts, (See above for address), for Citizens Communications Company, Counter Claimant.

represented by Douglas A. Grauel, Jay Varon, (See above for address), Lead Attorney, Attorney to be Noticed, E. Tupper Kinder, (See above for address), for UGI Utilities Inc, Counter Claimant.

represented by John S. Hahn, Julie Anna Potts, (See above for address), for Citizens Communications Company, Counter Defendant.

represented by Francis G. Kelleher, (See above for address), Lead Attorney, Attorney to be Noticed, for Honeywell International Inc, Counter Claimant.

represented by Francis G. Kelleher, (See above for address), Lead Attorney, Attorney to be Noticed, for Honeywell International Inc, Cross Defendant.

represented by John S. Hahn, (See above for address), for Citizens Communications Company, Counter Defendant.

represented by Mary F. Kellogg, (See above for address), for Guilford Transportation Industries, Inc, Cross Defendant.

represented by Mary F. Kellogg, (See above for address), for Maine Central Railroad Company, Cross Defendant.

represented by Mary F. Kellogg, (See above for address), for Guilford Transportation Industries, Inc, Cross Defendant.

represented by Robert S. Frank, (See above for address), Attorney to be Noticed, for Dead River Company, Cross Claimant.

represented by Mary F. Kellogg, (See above for ad-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
**(Cite as: 2004 WL 483201 (D.Me.))**

dress), for Guilford Transportation Industries, Inc, Cross Defendant.

 represented by Mary F. Kellogg, (See above for address), for Maine Central Railroad Company, Cross Defendant.

 represented by Francis G. Kelleher, (See above for address), Lead Attorney, Attorney to be Noticed, for Honeywell International Inc, Cross Claimant.

 represented by Mary F. Kellogg, (See above for address), for Guilford Transportation Industries, Inc, Cross Defendant.

 represented by Francis G. Kelleher, (See above for address), Lead Attorney, Attorney to be Noticed, for Honeywell International Inc, Counter Claimant.

 represented by Francis G. Kelleher, (See above for address), Lead Attorney, Attorney to be Noticed, for Honeywell International Inc, Cross Claimant.

 represented by Mary F. Kellogg, (See above for address), for Guilford Transportation Industries, Inc, Cross Defendant.

 represented by John S. Hahn, (See above for address), for Citizens Communications Company, ThirdParty Plaintiff.

 represented by Mary F. Kellogg, (See above for address), for Maine Central Railroad Company, Third-Party Defendant.

 represented by Kevin M. Cuddy, Cuddy & Lanham, Bangor, ME, Lead Attorney, Attorney to be Noticed, for Robinson Speirs, Jr, ThirdParty Defendant.

 represented by Kevin M. Cuddy, (See above for address), Lead Attorney, Attorney to be Noticed, for Julie Ann MacMannis, ThirdParty Defendant.

 represented by Kevin M. Cuddy, (See above for address), Lead Attorney, Attorney to be Noticed, for Nancy S Dawson, ThirdParty Defendant.

 represented by Kevin M. Cuddy, (See above for address), Lead Attorney, Attorney to be Noticed, for

Elizabeth H Speirs, ThirdParty Defendant.

 represented by Kevin M. Cuddy, (See above for address), Lead Attorney, Attorney to be Noticed, for Mary S Price, ThirdParty Defendant.

 represented by Kevin M. Cuddy, (See above for address), Lead Attorney, Attorney to be Noticed, for Robinson Speirs, ThirdParty Defendant.

 represented by Francis G. Kelleher, (See above for address), Lead Attorney, Attorney to be Noticed, Robert L. Brennan, (See above for address), Attorney to be Noticed, for Honeywell International Inc, ThirdParty Plaintiff.

 represented by Francis G. Kelleher, (See above for address), Lead Attorney, Attorney to be Noticed, for Honeywell International Inc, Cross Defendant.

RECOMMENDED DECISION ON CITIZENS COMMUNICATIONS COMPANY'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AND ORDER ON MOTION TO DEEM FACTS ADMITTED

KRAVCHUK, Magistrate J.

 **\*1** The City of Bangor has filed suit against Citizens Communications Company seeking, among other relief, (1) a judgment ordering Citizens to "pay all of the costs" incurred by the City to date in association with its ongoing, voluntary "investigation, corrective action and other response actions" to remediate hazardous substances associated with a certain tar slick on the bottom of the Penobscot River and (2) a declaration that Citizens is "jointly and severally liable for all future response costs the City incurs in connection with" the same. These requests are set forth in the first two counts of the City's Second Amended Complaint (Docket No. 175) and are premised on sections 107 and 113(g)(2) of the Comprehensive Environmental Response, Compensation and Liability Act (CER-CLA), 42 U.S.C. §§ 9607, 9613(g)(2). In the alternative, the City has requested, in its third and fourth counts, an order that Citizens pay an equitable share of past, present and future environmental response costs pursuant to CERCLA § 113(f) & (g), 42 U . S.C. § 9613(f), (g). Citizens moves for summary judgment only against counts one and two, contending that the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
**(Cite as: 2004 WL 483201 (D.Me.))**

City is itself potentially responsible for the tar slick and, therefore, is barred from pursuing full recovery of its costs as a matter of law. I recommend that the Court grant the motion by finding that no genuine issue of material fact exists but that the City is itself potentially responsible for the tar slick and therefore, as a matter of law, may not obtain a judgment that imposes liability on Citizens for *all* of the City's costs, reserving for a later date the question of whether a lesser remedy might be available to the City under CERCLA § 107. [FN1]

> FN1. For reasons that will become apparent herein and in the companion Recommended Decision on the Army Corp of Engineers's motion for judgment on the third-party claims, this issue concerns much more than just the scope of the City's damages, particularly insofar as the third-party defendants are concerned.

Facts [FN2]

> FN2. The factual statement recited herein is drawn from the parties' Local Rule 56 statements of material facts in accordance with the Local Rule. The factual statement construes the available evidence in the light most favorable to the non-movants and resolves all reasonable inferences in their favor. *Thames Shipyard & Repair Co. v. United States,* 350 F.3d 247, 276 (1st Cir.2003).

With its CERCLA claims the City of Bangor seeks to impose on Citizens Communications Company "all of the costs the City has incurred [and will incur] in connection with investigation, corrective action, and other response costs associated with releases of hazardous substances at the tar slick in the Penobscot River." (Second Amended Complaint, prayers for relief, at 9-10 & 11.) The tar slick at issue, according to the complaint, "begin[s] at the outfall of [an] Old Stone Sewer flowing from [a former manufactured gas plant] Site and extend[s] at least 1,500 feet downstream." (*Id.,* ¶ 22.) To date, the City has incurred "at least $1,000,000.00 in investigating the tar slick." (Docket No. 206, ¶ 15.)

Citizens is the successor of a series of corporate entities that owned and operated the gas plant beginning in approximately 1852 and continuing through 1963. (Docket No. 206, ¶¶ 1, 25-27; Docket No. 227, ¶¶ 25-27.) In 1852, the City assented to the operation of the plant by the Bangor Gas Light Company, on condition that the company "construct, maintain and use a covered drain, extending from their works to the Penobscot River to below low water mark, of sufficient capacity to carry off all the residuum of filth of said works." (Docket No. 206, ¶ 2, Ex. 1.) [FN3] There is no indication that the company constructed such a drain. Rather, in 1860 the company requested that the City construct-and the City undertook to have constructed-a "public sewer" for this purpose. (Docket No. 181, ¶ 8; Docket No. 227, ¶ 2, Exs. 3, 4 & 5.) [FN4] Four decades later, in 1901, the company complained to the City of damage to its property as a consequence of the City's connection of a public sewer system to the company's "private drain," in effect characterizing at least a portion of the sewer (commonly described as the "Old Stone Sewer" or the "Davis Brook Sewer") [FN5] as the company's private property (Docket No. 206, ¶ 3 Additional) and further revealing that sometime between 1860 and 1901 the outflow of the sewer began discharging wastewater originating not only from the gas plant, but also from a broader municipal sewer system. (Docket No. 181, ¶¶ 6, 9 & Ex. 12 at 135 (Deposition testimony of the City's expert witness, James Ring).) The City's expert witnesses opine that the sewer was the conduit through which the company discharged tar-laden wastewater, based on, among other things, the presence of the tar plume or slick in the Penobscot River that appears to originate at the outfall of the Old Stone Sewer and a trail of tar deposits in the soil underneath the sewer that can be traced back to the "former tar water separator tank" of the former gas plant. (Docket No. 206, ¶¶ 4-12 Additional.) It is undisputed that tar is classified as a "hazardous substance" for purposes of CERCLA. (*Id.,* ¶ 9 Additional; Docket No. 227, ¶ 9.) It is also undisputed that tar is a byproduct of manufactured gas operations. (Docket No. 206, ¶ 16 Additional; Docket No. 227, ¶ 16.)

> FN3. The entire 1852 "Resolve" of the "Common Council" of the City of Bangor reads as follows:
> A Resolve granting the assent of the City Council to the location of the works of the Gas Light Company. Resolved, that the assent of the City Council of said city, be and is hereby given to the Bangor Gas Light Company to erect, establish and continue, proper

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
(Cite as: 2004 WL 483201 (D.Me.))

and sufficient works for the manufacture of Gas, upon the lot of land in and adjoining "[unknown] Brick Yard" in said City, in the rear of Main Street, recently purchased by said Company for that purpose. And also to lay down in and through any of the Streets of said City, such pipes for the conveyance of Gas as may be necessary for carrying into effect the objects of the Incorporation of said Company, Subject to the restrictions and provisions contained in the Charter of said Company and to all the By Laws and ordinances of the City. Provided however, and this assent is upon condition that, said Company shall construct, maintain and use a covered drain, extending from their works to the Penobscot River to below low water mark, of sufficient capacity to carry off all the residuum of filth of said works. Provided further, that in laying their pipes through the streets and sidewalks, they shall replace the each and sidewalks in as good condition as they found them, and to the acceptance of the Mayor of the City.

FN4. On July 9, 1860, the Bangor Board of Aldermen "met according to adjournment" and passed the following:
"ORDERED, That the Mayor and Aldermen deem it necessary for public convenience and health, that a public Drain or Sewer be laid out and constructed as recommended in the Report of the Committee to whom was referred the petition of the Bangor Gas Light Company, and that notice be given agreeably to law, to all persons interested in the premises which said Sewer will cross to be heard in damages. Passed:
The Mayor and Aldermen thereupon issued the following notice and ca[u]sed the same to be posted up and published according to law:
"The undersigned, Mayor and Aldermen of the City of Bangor, hereby give notice, that in pursuance of a petition of the Bangor Gas Light Company, dated May 7, 1860, and in pursuance of a report of a Committee of the Board of Mayor and Aldermen, to whom was referred said petition, and [illegible]." On the same day, Mayor Stetson made the following order:
Ordered that the Mayor & Aldermen deem it necessary for public convenience & health,

that a public drain or sewer be laid out & constructed as recommended in the report of the Committee to whom was referred the Petition of the Said Gas Light Company & that notice be given ... to all persons interest[ed] in the premises, which said Sewer will cross, to be heard in damages.
(Docket No. 227, Ex. 4.) The Mayor further ordered on August 6, 1860:
"That the Mayor and Alderman Leighton be a Committee to employ some competent Engineer to survey & return a plan for a public Sewer from the vicinity of the Gas Works to tide water, at the Rail Road Wharf, as prayed for, by said Gas Company.
(*Id.*, Ex. 5.)

FN5. The parties sometimes refer to a physical drain installation existing down grade from the gas plant and extending into the River as the "Davis Brook Sewer" or the "Old Stone Sewer." It appears that the earliest drainage installation involved a full or partial enclosure of an existing, natural drainage route (Davis Brook) with stone. (See Docket No. 181, ¶ 6; Docket No. 206, ¶ 6, ¶ 2 Additional.)

**\*2** The former gas plant property is not adjacent to the Penobscot River, but is roughly 1000 feet away, with the Main Street of Bangor running between the property and the River. (Docket No. 206, ¶ 17 Additional; Docket No. 227, ¶ 17.) In 1978 the City acquired the parcel on which the gas plant operated and sold the parcel in 1995, after demolishing the remaining fixtures and "addressing" contamination at the parcel. (Docket No. 181, ¶¶ 10, 11; Docket No. 206, ¶ 21 Additional.) This parcel and an adjacent parcel, now known as the Second Street Park, were acquired by the City under a community development program that authorized the City to exercise its development powers to acquire property by purchase or by eminent domain. (Docket No. 206, ¶ 19 Additional.) The City currently owns substantial riverfront property on the opposite side of Main Street along the Penobscot River (the riverfront property), including that location along the banks where the Old Stone Sewer discharged into the River. (Docket No. 181, ¶ 1.) The City's title in this property extends to the mean low water mark. (*Id.*, ¶ 2.) Tar produced at the gas plant is currently present in the inter-tidal zone of the river-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
**(Cite as: 2004 WL 483201 (D.Me.))**

front property. (Docket No. 181, ¶ 4; Docket No. 206, ¶ 14 Additional.)

The Maine Department of Environmental Protection (MDEP) has certified its approval of completions of Voluntary Remedial Action Plans for the former gas plant property, the Second Street Park, and the portion of the City's riverfront property upland of the inter-tidal zone. (*Id.,* ¶ 24 Additional.) Both the MDEP and the United States Environmental Protection Agency (EPA) have opined that contamination at the former gas plant property is no longer discharging into the River. (*Id.,* ¶¶ 21-22 Additional.)

The City's Motion to Deem Facts Admitted
The City has filed a motion captioned "Motion to Deem Facts Admitted Pursuant to Local Rule 56(e), for Failure to Controvert Plaintiff's Statement of Additional Facts." (Docket No. 249.) With this motion, the City seeks to have the Court treat several of its statements of additional material fact as "admitted by Citizens for all purposes in this litigation." (*Id.* at 2.) In particular, the City refers to its additional statements numbered 1, 3-8, 10-16 and 28. In reply to many, but not all, of these additional statements, Citizens's offered a denial, followed by a statement to the effect that the City's additional statement is immaterial to the issues presented in Citizens's motion for partial summary judgment. Citizens's denials are not backed up with record citation. (Docket No. 227, ¶¶ 4-8, 10-12, and 15.) In other instances, Citizens has admitted, partially admitted, or qualified the City's statements without record citation. (*Id.* ¶¶ 1, 13-14, 16.) In two instances, Citizens has qualified the City's statements by referring the Court to the record citation offered by the City (¶ 3), and by criticizing the terminology used by the City to characterize the legal ramifications of certain facts (¶ 28). According to the City, Citizens's "refusal to admit facts that it does not properly dispute serves to waste the parties resources as well as the limited resources of the court, and threatens additional unjust delay in this litigation." (Docket No. 249 at 1.)

**\*3** Nowhere in the City's motion is there a reference to Federal Rule 56(d), as opposed to Local Rule 56(e). Federal Rule 56(d) authorizes the Court, in cases not fully adjudicated on motion, "at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel" to make "an order specifying the facts that appear without sub-stantial controversy" and to deem such facts established for purposes of trial. Although the Court might be inclined to engage in such an investigation, I am not inclined to engage in that process for purposes of a trial that I will not be conducting, nor does the present motion for partial summary judgment appear to be the appropriate context for the Court to establish what facts "appear without substantial controversy." With the exception of one statement of fact pertaining to Citizens's "corporate history," the City's statement of additional material facts sets forth factual assertions that are not easy to assess without the aid of expert testimony. Moreover, many of the factual statements offered by the City, although helping to explain the basis for the City's claims against Citizens, are not material to the narrow legal question raised by this motion for partial summary judgment on the claims for "full recovery" pursuant to CERCLA § 107. Thus, it would be entirely unproductive for the Court to sift through statements of material facts and record citations that, ultimately, would not be material to the determination of the narrowly-focused partial summary judgment motion that is before it. Finally, I observe that the discovery deadline for the City has been repeatedly extended and remained open throughout the pendency of this motion. [FN6] I can see no good reason why the City could not have pursued the admissions it wants through the normal channel: Rule 36. The motion to deem facts admitted "for all purposes" is DENIED. [FN7]

> FN6. The deadline for the City and Citizens to complete discovery on the complaint was February 23, 2004. (Report of Tel. Conf., Order on Misc. Mots. and Am. Sched. Order, Docket No. 200, at 3.) The City filed its motion to deem facts admitted for all purposes on December 19, 2003.

> FN7. Although I deny the motion to deem facts admitted "for all purposes," it will be evident to the parties that I have credited some of the City's statements of additional material facts for purposes of Citizens's motion for partial summary judgment, to the extent I have deemed those statements to be both relevant to my discussion and "supported by a record citation." D. Me. Loc. R. 56(c).

Summary Judgment Discussion

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
**(Cite as: 2004 WL 483201 (D.Me.))**

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *United States Steel v. M. DeMatteo Constr. Co.,* 315 F.3d 43, 48 (1st Cir.2002). According to Citizens, it is entitled to summary judgment on the first two counts of the City's complaint because the City is a potentially responsible party when it comes to the tar slick and, as such, cannot maintain claims for a full recovery of its response costs as a matter of law.

The Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675 (1995 & Supp.2003), is a "comprehensive statute" that "was enacted in response to the serious environmental and health risks posed by industrial pollution ." *United States v. Bestfoods,* 524 U.S. 51, 55, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). "It is ... designed to protect and preserve public health and the environment ." *United States v. Kayser-Roth Corp.,* 910 F.2d 24, 25 (1st Cir.1990). In addition to providing a mechanism for the federal government to clean up hazardous-waste sites, CERCLA incorporates civil action provisions that enable local governments and private parties who undertake cleanups to "impose[ ] the costs of cleanup on those responsible for the contamination." *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 7, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989); *see also* 42 U.S.C. §§ 9607, 9613(f). Importantly, CERCLA's definitional provisions make it clear that local governments are liable along with everyone else for cleanup costs recoverable under CERCLA. 42 U.S.C. § 9601(20)(D). "The remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is potentially responsible for hazardous-waste contamination may be forced to [pay for] the costs of cleanup." *Id.,* at 21 (plurality opinion of Brennan, J., quoted with approval in *Bestfoods,* 524 U.S. at 56 n. 1).

**\*4** According to the First Circuit Court of Appeals, CERCLA provides two "actions," or remedies, by which the costs of responding to hazardous-waste contamination can be reallocated among private parties in litigation: "actions for recovery of costs" and "actions for contribution." *United Tech. Corp. v. Browning-Ferris Indus.,* 33 F.3d 96, 99 (1st Cir.1994), *cert. denied,* 513 U.S. 1183, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995) ("*UTC"* ). Actions for recovery of costs are available only to "innocent parties that have undertaken cleanups." *Id.* Actions for recovery of costs enable an innocent party that engages in a clean-up "to recoup the whole of [its] expenditures" from any non-innocent party. *Id.* at 100. Actions for contribution, on the other hand, enable a non-innocent party to recover only "that portion of his expenditures which exceeds its pro rata share of the overall liability." *Id.* (referring to CERCLA's § 113(f) remedy). Whether a CERCLA plaintiff is "innocent" depends on whether that party is itself potentially liable for environmental contamination under CERCLA § 107. The label customarily used by courts and counsel to describe a non-innocent plaintiff is "potentially responsible party" or "PRP." As a matter of law, PRPs are precluded from pursuing a "full recovery" under § 107(a) and must make do with contribution, or equitable apportionment, in accordance with CERCLA § 107(a)(4)(B) and/or § 113(f), 42 U.S.C. § 9613(f). *Id.* at 99-101; *Dico, Inc. v. Chem. Co.,* 340 F.3d 525, 530 (8th Cir.2003) (collecting circuit court precedents). [FN8]

> FN8. It is sometimes said that a PRP cannot pursue a § 107(a) claim, only a § 113(f) claim. Actually, "any person may seek to recover costs under § 107(a), but ... it is the nature of the action which determines whether the action will be governed exclusively by § 107(a) or by § 113(f) as well." *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.,* 153 F.3d 344, 353 (6th Cir.1998) (citing *UTC,* 33 F.3d at 101).

CERCLA § 107 provides the standard for CERCLA liability. Section 107(a) sets forth four categories of "covered persons" who are liable for hazardous-waste releases and the associated costs and damages. The four categories are:

(1) "owner and operator of a vessel or facility";

(2) "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of";

(3) "any person who by contract, agreement, or otherwise arranged for disposal ... of hazardous substances"; and

(4) "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ... from which there is a release,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

or a threatened release which causes the incurrence of response costs."

42 U.S.C. § 9607(a)(1)-(4). Importantly, the subsection (a)(4) phrase "from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance" is generally understood to modify paragraphs (1) through (3), as well as paragraph (4). *Control Data Corp. v. S.C.S.C. Corp. .*, 53 F.3d 930, 934-35 & n. 7 (8th Cir.1995) (citing *State of New York v. Shore Realty Co.,* 759 F.2d 1032, 1043 n. 16 (2d Cir.1985)). [FN9] Those parties falling within one of the four categories set out in § 107(a) "shall be liable for [*inter alia* ] all costs of removal or remedial action incurred by ... a State [FN10] ... not inconsistent with the national contingency plan," and "any other costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. §§ 9607(a)(4)(A) & (B).

> FN9. According to the Second and Eighth Circuit Courts of Appeals, the clause was meant to appear on a separate line from subsection (4) but did not on account of a printer's error. *Control Data Corp. .*, 53 F.3d at 934 n. 7; *Shore Realty,* 759 F.2d at 1043 n. 16.

> FN10. There is an open question whether municipalities automatically qualify as states for purposes of § 107(a)(4)(A), but the weight of authority suggests they do not. *Fireman's Fund Ins. Co. v. City of Lodi,* 296 F.Supp.2d 1197, 1215 n. 33 (E.D.Cal.2003); *City of New York v. Chemical Waste Disposal Corp.,* 836 F.Supp. 968, 977 (E.D.N.Y.1993); *Rockaway v. Klockner & Klockner,* 811 F.Supp. 1039, 1048 (D.N.J.1993). The more likely source of a municipality's cause of action is under § 107(a)(4)(B), which imposes liability on polluters for response costs incurred by "any other person."

**\*5** The national contingency plan is a series of regulations, promulgated by the [EPA], that establish the procedures and standards for government and voluntary response actions to hazardous substances. Those regulations provide that a remedial action is consistent with the national contingency plan if it results in a "CERCLA quality cleanup." 40 C.F.R. § 300.700(c)(3)(ii). A "CERCLA-quality cleanup," in

turn, is defined as a cleanup that is "protective of human health and the environment ... and ... cost effective." 55 Fed.Reg. 8666, 8793 (1990).

*Blasland, Bouck & Lee, Inc. v. City of N. Miami,* 283 F.3d 1286, 1295 (11th Cir.2002). Despite this relatively unqualified indication that those parties associated with hazardous waste contamination are "liable" to those parties who clean it up, the courts have superimposed sluiceways to channel CERCLA plaintiffs, the gates to which will open or close depending on the plaintiff's ability to meet certain criteria, the most important of which is "innocence." Which gate opens has a direct impact on the burden of proof the plaintiff must carry and what reward it might attain for its cleanup activities. The sluiceway every plaintiff wants to ride readily admits only those plaintiffs who are "innocent" of contamination, that is, those plaintiffs who are not themselves PRPs. *UTC,* 33 F.3d at 99-100. Assuming their response costs were incurred consistent with the national plan, these plaintiffs can obtain a judgment imposing strict and "full" liability for response costs on a defendant polluter based on a relatively simple showing that one of the four § 107(a) categories describes that defendant. *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.,* 153 F.3d 344, 348 (6th Cir.1998). It is unclear whether a "non-innocent" plaintiff can ever gain access to this sluiceway because courts have characterized § 107's remedy as a "full recovery," something that plaintiffs falling within any one of the four categories of PRP defined in § 107(a) paragraphs (1) through (4) are not entitled to unless they can prove that one of the three statutory defenses are applicable. [FN11] *See, e.g.,* *UTC,* 33 F.3d at 100 (" 'Actions for recovery of costs,' suggests full recovery; and it is sensible to assume that Congress intended only innocent parties-not parties who were themselves liable-to be permitted to recoup the whole of their expenditures."). Instead, courts seem generally inclined to channel non-innocent plaintiffs down a second sluiceway, one that leads to CERCLA § 113(f), 42 U.S.C. § 9613(f). Section 113(f) permits "[a]ny person who [to] seek contribution from any other person who is liable or potentially liable under section 9607(a) ... during or following any civil action under section 9606 ... or under section 9607(a)." But a potential problem arises with this approach, because not all PRP-plaintiffs [FN12] who incur response costs do so in response to a "civil action." Some PRP-plaintiffs incur response costs voluntarily, or at least independent of administrative enforcement or other civil action. Thus, they are not seeking contribution "during or following any civil

action under section 9606 ... or under section 9607(a)." *Id., § 9613(f)*. The courts appear to be divided about whether these "volunteer" PRP plaintiffs should be sluiced:

> FN11. These are the so-called act of God, act of war, and third-party defenses found at § 107(b)(1)-(3). The City raises the § 107(b)(3) third-party defense, discussed below in sections 1 and 3 of this Recommended Decision.

> FN12. A § 113(f) claim may also be utilized by, and perhaps was created for, a CERCLA defendant to cross-claim against co-defendants or to launch a third-party action against PRPs not named by the CERCLA plaintiff in its first-party action.

**\*6** (1) Through § 113(f), regardless of the "during or following" language and based on the § 113(f) "savings clause" that "[n]othing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 106 or section 107" and a liberal construction of what constitutes a "contribution" action, *see Aviall Servs., Inc. v. Cooper Indus., Inc., 312 F.3d 677 (5th Cir.2002)* (en banc) (Barksdale, Garza and Smitt, JJ., dissenting), *cert. granted, --- U.S. ----, 124 S.Ct. 981, 157 L.Ed.2d 811 (2004);*

(2) Through § 107(a)(4)(B), albeit without the availability of "full recovery" and with the additional burden of proving up what proportional share of the plaintiff's response costs should be imposed on the defendant, *cf. UTC, 33 F.3d at 99 n. 8* ("It is possible that, although falling outside the statutory parameters established for an express cause of action for contribution, ... a PRP who spontaneously initiates a cleanup without governmental prodding might be able to pursue an implied right of action for contribution under 42 U.S.C. § 9607(c)."); [FN13] or

> FN13. The First Circuit's citation to authority in *UTC* reads as follows:
> *See Key Tronic Corp. v. United States, 511 U.S. 809, 114 S.Ct. 1960, 1966, 128 L.Ed.2d 797 (1994)* (explaining that CERCLA now "expressly authorizes a cause of action for contribution in [§ 9613] and impliedly authorizes a *similar* and some what overlapping remedy in [§ 9607]"); *cf. In re Hemingway*

*Transp., Inc., 993 F.2d 915, 931 (1st Cir.)* (stating in dictum that "in the event the private-action plaintiff itself is potentially 'liable' to the EPA for response costs, and thus is akin to a joint 'tortfeasor,' section 9607(a)(4)(B)" serves as the pre-enforcement analog to the 'impleader' contribution action permitted under section 9613(f)"), *cert. denied, 510 U.S. 914, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993).*
*UTC, 33 F.3d at 99 n. 8* (emphasis added). *See also City of Fresno v. NL Indus., Inc., No. 93-5091, 1995 WL 641983, *2, 1995 U.S. Dist. LEXIS 15534, *10-14 (E.D.Cal. July 9, 1995)* (collecting cases that address "the issue of whether an action brought by one PRP against another must be characterized as one for contribution under § 113").

(3) Down the drain, *see E.I. Du Pont De Nemours and Co. v. United States, 297 F.Supp.2d 740, 750-53 (D.N.J. Jan.5, 2004)* (holding that Congress did away with any judicially recognized "contribution" action under § 107 when it created § 113(f), that a PRP who voluntarily incurs response costs cannot maintain an action for mere "recoupment or reimbursement," that "a contribution action requires two parties who are jointly and severally liable to some third-party," that the contribution claimant was compelled to incur the costs in question, and that the contribution claimant has discharged the entire underlying claim).

In sum, if Citizens can establish, for purposes of summary judgment, that the City is a PRP, then pursuant to *UTC,* the City cannot obtain a "full recovery" under CERCLA § 107(a) as a matter of law, but may be able preserve some form of § 107(a)(4)(B) claim for contribution or a similar equitable remedy. [FN14] *UTC, 33 F.3d at 99, cert. denied, 513 U.S. 1183, 115 S.Ct. 1176, 130 L.Ed.2d 1128*. According to Citizens, the City is a PRP because it is liable (1) as an owner of the contaminated riverfront property through which tar migrated and continues to migrate on its way to the River, (2) as a former owner of the gas plant, (3) as an operator of the sewer lines through which tar was allegedly discharged into the Penobscot River and (4) as an arranger of disposal by virtue of its involvement in the establishment and creation of the sewer in the mid-1800s. (Citizens' Mot. Partial Summ. J., Docket No. 176, at 8-12.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
(Cite as: 2004 WL 483201 (D.Me.))

FN14. *See* footnote 13, *supra.* The First Circuit Court of Appeals's characterization of the § 107(a) remedy as providing a "full recovery" appears to be based on the § 107(a)(4)(A) language, "shall be liable for ... all costs." But this language is used in conjunction with liability to the United States, a state or an Indian tribe. By contrast, § 107(a)(4)(B) describes liability for *"any other* necessary costs of response incurred by any other person." 42 U.S.C. § 9607(a)(4)(B) (emphasis added).

Currently before the Supreme Court is the question, not raised by the parties herein, of whether a polluter who incurs response costs voluntarily, *i.e.,* in the absence of a civil action or enforcement proceeding by the United States or a state, *see* 42 U .S.C. §§ 106 & 107(a)(4)(A), has standing to pursue a contribution remedy pursuant to § 113(f), the remedy requested by the City in its third and fourth counts. The countervailing arguments are thoroughly set forth in *Aviall Servs., Inc. v. Cooper Indus., Inc.,* 312 F.3d 677 (5th Cir.2002) (en banc) (Barksdale, Garza and Smitt, JJ., dissenting), *cert. granted, --- U.S. ----, 124 S.Ct. 981, 157 L.Ed.2d 811 (2004)* and in *E .I. Du Pont De Nemours and Co. v. United States,* 297 F.Supp.2d 740 (D.N.J. Jan.5, 2004) (presenting an alternative to the two positions set forth in *Aviall* ). This issue focuses on the nature of a contribution action as one in which the contribution plaintiff has already extinguished the contribution defendant's liability and on the limiting temporal language used by Congress in section 113(f):

Any person may seek contribution from any other person who is liable or potentially liable under section 107(a) [42 USCS § 9607(a) ], *during or following* any civil action under section 106 [42 USCS § 9606] or under section 107(a) [42 USCS § 9607(a) ].

42 U.S.C. § 9613(f) (emphasis added). *See also Aviall,* 312 F.3d at 682-83 (discussing precedents indicating that "prior government involvement [is] not a prerequisite to recoupment of § 107 response costs by one group of PRPs against other PRPs"); *Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298, 1301-02 (9th Cir.1997) (holding that "only a claim for contribution lies be-

tween PRPs," observing that section 113(f) governs where one PRP brings a section 107 action against another PRP, and citing cases). On a related note, I have some concern as to whether section 107(a) really authorizes even an "innocent" private party plaintiff to obtain prospective relief, *i.e.,* a declaration as to a defendant's future liability when the plaintiff has not already completed, or even started, cleaning up the contamination at issue. I raise this concern because the City is asking the Court to, among other things, make an allocation of costs that have yet to be expended and therefore cannot necessarily presently be evaluated as both "necessary" and "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B).

In any event, if this Court agrees with the recommendation contained herein, that the City is itself also potentially responsible for the tar slick and therefore cannot obtain a "full recovery" in its first two counts, and if the Supreme Court holds that a polluter who voluntarily incurs response costs cannot maintain a claim for contribution against fellow polluters pursuant to section 113(f), then it would seem that the CERCLA component of this litigation would be concluded.

*1. The City's ownership of the riverfront property (§ 107(a)(1)).*

Pursuant to CERCLA § 101, "[t]he term 'owner or operator' means ... in the case of an onshore facility ... any person owning or operating such facility." 42 U.S.C. § 9601(20)(A). "Facility" is defined as "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer ... ) ... or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." *Id.* § 9601(9).

**\*7** Citizens argues that the tar slick in the River, the City's riverfront property, the former gas plant site and the intervening land through which the sewer passed must be understood as one unified facility for purposes of CERCLA. So understood, says Citizens, the City is potentially liable as an owner because it is the current owner of the riverfront property, part of the facility. [FN15] However, the City has limited its CERLCA action to recover costs associated only with the River

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
(Cite as: 2004 WL 483201 (D.Me.))

"facility." In its Second Amended Complaint, the City's § 107 "prayers for relief" all seek an order that Citizens pay the response costs the City has "incurred in connection with investigation, corrective action, and other response actions associated with releases of hazardous substances at the tar slick in the Penobscot River." (Docket No. 175 at 9-10 & 11.) Furthermore, in opposition to summary judgment, the City asseverates that "the 'facility' properly before the court under section 107 is Dunnett's Cove in the Penobscot River," evidencing the limitation the City has placed on its cause of action. (Docket No. 205 at 9.)

> FN15. In Citizen's own words. "While the City's Second Amended Complaint ... cha-racterize[s] only the Penobscot River as a facility, based on the City's allegation that the [former gas plant] was the source and the Old Stone Sewer the conduit ... those areas also constitute parts of the 'facility' in question." (Docket No. 176 at 7-8.)

As with all things CERCLA, the facility issue is puzzling. On the one hand, at least one Court of Appeals has suggested that "the bounds of a facility should be defined at least in part by the bounds of the contamination." *United States v. Township of Brighton,* 153 F.3d 307, 313 (6th Cir.1998). *See also Axel Johnson, Inc. v. Carroll Carolina Oil Co.,* 191 F.3d 409, 417 (4th Cir.1999) (observing that a contrary approach might be illogical when taken to the extreme because it "would mean that each barrel in a landfill is a separate facility-a proposition ... aptly described as ridiculous.") (quotation marks and citation omitted). On the other hand, a facility is a location "from which there is a release, or a threatened release which causes the incurrence of response costs ... consistent with the national contingency plan." 42 U.S.C. § 9607(a); *Control Data Corp.,* 53 F.3d at 934-35 & n. 7 (concerning the manner in which qualifying language in § 107(a)(4) modifies all four liability provisions of § 107(a)); *Carson Harbor Village, Ltd. v. Unocal Corp.,* 270 F.3d 863, 871 (9th Cir.2001) ("Remediation costs are recoverable under CERCLA only if 'necessary.' It is generally agreed that this standard requires that an actual and real threat to human health or the environment exist before initiating a response action."), *cert. denied,* 535 U.S. 971, 122 S.Ct. 1437, 152 L.Ed.2d 381 (2002); *United States v. Northeastern Pharm. & Chem. Co.,* 810 F.2d 726, 743 (8th Cir.1986) ("In the present case ... the place where the

hazardous substances were disposed of and where the government has concentrated its cleanup efforts is the Denney farm site, not the [originating] NEPACCO plant. [Thus,] [t]he Denney farm site is the 'facility.' "). Thus, there appears to be incorporated into § 107(a)(1)'s concept of facility ownership an understanding that ownership pertains to the facility where response costs are being expended, not ownership of any facility causally connected to the deposition of hazardous substances at the facility where response costs are being expended. FN16 Thus the City's prior ownership of the Gas Plant site and even the sewer (if indeed it ever did own the sewer through which the tar passed) do not provide a basis for § 107(a)(1) liability.

> FN16. Of course, what is sauce for the goose is sauce for the gander. If this rationale is credited by the Court, as the City advocates, then the City cannot establish, in its case-in-chief, § 107(a) liability on the part of Citizens based solely on Citizens's (and its predecessors) ownership of the former gas plant.

*8 In this case, the available summary judgment facts, construed most favorably to the City, support a finding that the River and the upland riverfront property have come to be distinct depositories of the former gas plant's tar, with only the River, including the inter-tidal zone, requiring the expenditure of response costs. The summary judgment record is otherwise undeveloped with respect to whether the riverfront property outside of its inter-tidal zone is presently a facility that releases or threatens the release of hazardous materials into the River, or elsewhere, so as to justify the incurrence of response costs consistent with the national contingency plan. FN17 However, the City concedes in its memorandum that it holds an ownership interest in the inter-tidal zone and that "the intertidal zone ... is part of the 'facility.' " (Docket No. 205 at 15). Thus, under its own version of the facts the City clearly meets the definitional language of § 107(a)(1) in that it is the owner of a portion of the facility in question. This makes the City a PRP, unless it can establish a defense to liability under § 107(b).

> FN17. The evidence that is properly before the Court suggests that both the MDEP and the EPA have opined that contamination at the former gas plant site is no longer migrating into the River. It is also worth noting

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 12
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
**(Cite as: 2004 WL 483201 (D.Me.))**

that subterranean migration of tar, in and of itself, would not necessarily generate CERCLA liability on the part of the City, as is discussed below in section 2.

The City maintains that its § 107(a)(1) liability is negated by the § 107(b)(3) third-party defense, 42 U.S.C. § 9607(b)(3), because the release of hazardous substances there did not occur in connection with a "contractual relationship" between the City and any party that discharged the waste in question. The City's focus on the "contractual relationship" issue is a red herring. For purposes of the application of the third-party defense in this case, the question is simply this: Has the City produced facts that could support a finding by a preponderance of the evidence that the release or threat of release of a hazardous substance at the riverfront property's inter-tidal zone was "caused solely by ... an act or omission of a third party?" 42 U.S.C. § 9607(b)(3). The answer to this question is "no" and is addressed below in section 3, where I discuss the legal significance of the City's past sewer activities.

Even if the City's third-party defense did turn in some way on § 107(b)(3)'s "contractual relationship" concept, that concept is defined in § 101(35)(A) to include land contracts and deeds, unless (1) the party acquired the property "after the disposal or placement of the hazardous substance on, in, or at the facility," and (2) at least one of three other circumstances is "established by a preponderance of the evidence." 42 U.S.C. § 9601(35)(A). With respect to the riverfront property, [FN18] the additional circumstance that the City points to requires proof that "[a]t the time the [City] acquired the facility the [City] did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility." 42 U.S.C. § 9601(35)(A)(i). According to the City, it is an "innocent purchaser" and "innocent owner" of the riverfront property because it acquired the property after the placement of hazardous substances there and "because it acquired the [property] after the DEP had certified the VRAP clean-up of that parcel." [FN19] (Docket No. 176 at 16.) These arguments bear little resemblance to the statutory test, which concerns a purchaser's *knowledge* of the past disposal of hazardous substances at the facility and the City does not cite any authority supporting this kind of deviation from the statute. For obvious reasons, the City has not at-

tempted to disavow knowledge on its part of disposals "on, in, or at" the riverfront property. The one case cited by the City, New York v. Lashins Arcade Co., 91 F.3d 353 (2nd Cir.1996), supports the proposition that the mere conveyance of contaminated property is not the kind of "contractual relationship" that precludes the acquiring landowner from raising the third-party defense unless the contract related in some way to hazardous substances or otherwise exerted control over a past owner's activities. Id. at 360 (citing Westwood Pharms., Inc. v. Nat'l Fuel Gas Distrib. Corp., 964 F.2d 85, 91-92 (2d Cir.1992). However, resolution of the appeal in *Lashins* "turn [ed] upon the validity of the district court's ruling that Lashins was entitled to summary judgment on the question whether Lashins 'exercised due care with respect to the hazardous substance concerned ... in the light of all relevant facts and circumstances' within the meaning of § 9607(b)(3)." Id. at 360- 61. Because Lashins's *only* connection to the facility came after the discharge of hazardous waste there and because the EPA and New York State Department of Environmental Conservation were already overseeing an approved "Remedial Investigation/Feasibility Study of the facility the court concluded that Lashins could be deemed to have exercised due care. Id. at 362 ("[T]he cases cited by New York do not require the negation of Lashins' 'due care' defense. None involved a defendant who played *no role* in the events that led to the hazardous waste problem and came on the scene after public authorities were well along in a program of investigation and remediation.") (emphasis added). As discussed below in section 3, the City played an important role in connection with the discharge of hazardous substances at the facility.

> FN18. The City also argues that the facts pertaining to its acquisition of the Second Street Park and the gas plant property through a process akin to the exercise of eminent domain powers also implicate § 101(35)(A). Were this case directed at releases on those properties, I would address these arguments, but because the "facility" under consideration is narrowly construed as the River, including the inter-tidal zone, the method by which the City acquired the Park and the gas plant properties is irrelevant.

> FN19. In its statement of material facts, the City indicates that the VRAP certification

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
(Cite as: 2004 WL 483201 (D.Me.))

only applies to that portion of the riverfront property that is upland of the inter-tidal zone (Docket No. 206, ¶ 24), but the City's title extends to the mean low water mark. (Docket No. 206, ¶ 2.)

*2. The City's prior ownership of the gas plant (§ 107(a)(2)).*

**\*9** The City owned the former gas plant site from 1978 to 1995. According to Citizens, " 'The continuing spread and migration of Hazardous Substances' was occurring on the ... property before the City purchased it." (Docket No. 227, ¶ 12.) According to Citizens, this makes the City liable as a " 'person who at the time of disposal of any hazardous substance owned or operated' a facility ." (Docket No. 176 at 11 (citing § 107(a)(2)).) Thus, Citizens's argument is that the passive [FN20] spread and migration of hazardous substances deposited by a former owner constitutes "disposal" for purposes of determining a subsequent owner's liability under § 107(a)(2). In response, the City appropriately takes Citizens to task for asking the Court to infer the existence of post-1978 migration based on an assertion of pre-1978 migration. (Docket No. 205 at 19.) Drawing such inferences for a movant is not appropriate in the summary judgment context. The City then argues that, even if passive migration of hazardous substances did take place during its ownership of the gas plant parcel, passive migration is not "disposal" as a matter of law. (*Id.* at 19-20.)

> FN20. The evidence cited in support of Citizens's statement concerning the continuing spread and migration of hazardous substances is an interrogatory answer provided by the City. The City's interrogatory answer does not indicate that any affirmative disposal activities took place at the site during the City's ownership. In its memorandum of law Citizens relates what "appears" to be other evidence of leaks and spills from a storage tank on the property during the City's ownership, but the evidence it points to was never incorporated into Citizens's statement of material facts. On this record, I find that there is no evidence, for purposes of summary judgment, of any leak or spill during the City's ownership that contributed to the presence of hazardous substances in the soil or water beneath the former gas plant site. I

also observe that, even if this evidence were credited, there is no evidence that any leak or spill that might have occurred at the former gas plant site during the City's ownership and cleanup of the site contributed to the incurrence of any of the response costs associated with the tar slick in the Penobscot River, the "releasing" facility that this suit is directed toward.

CERCLA's definition of "disposal" incorporates by reference the definition provided in the Resource Conservation and Recovery Act, 42 U.S.C. § 9601(29). That definition states:

> The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). Although the definition describes two potentially "passive" agencies of disposal in the terms "spilling" and "leaking," *see Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 844-45 (4th Cir.1992) (holding that passive spilling and leaking from underground storage tanks constituted disposal), all of the terms nevertheless suggest some new introduction of hazardous substances to the environment. The summary judgment record that is before the Court does not contain evidence of hazardous substances being placed into or on any land or water at the parcel during the City's ownership of it. Because Citizens has not properly produced evidence of a "disposal" during the City's ownership of the former gas plant site, there is no basis in the summary judgment record for finding the City potentially responsible for the tar slick pursuant to § 107(a)(2)'s ownership language. Furthermore, the City correctly states that passive migration would not constitute "disposal," even if there were clear evidence that passive migration was occurring during this timeframe. *See Carson Harbor,* 270 F.3d at 874-79 (discussing several circuit precedents consistent with this conclusion and holding "that the gradual passive migration of contamination through the soil that allegedly took place during [a prior owner's] ownership was not a 'discharge, deposit, injection, dumping, spilling, leaking, or placing' and, therefore, was not a 'disposal' within the meaning of § 9607(a)(2)"). [FN21]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 3:08-cv-05722-RJB   Document 86   Filed 06/14/10   Page 38 of 41

Not Reported in F.Supp.2d                                                                                 Page 14
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
**(Cite as: 2004 WL 483201 (D.Me.))**

**FN21.** The *Carson Harbor* Court articulated several additional reasons for its holding, including effectuation of the statutory purpose that "responsible" persons pay for cleanups and the desire to ensure internal consistency within CERCLA. *Carson Harbor, 270 F.3d at 880-84.*

*3. The City's "operation" of the sewer line or "arrangement" of disposals vis-à-vis the sewer line (§ 107(a)(2) or (3)).*

**\*10** Ultimately, Citizens's motion turns on the legal significance of one undisputed fact: that the City constructed or otherwise attended to the construction of a sewer to transport the gas plant's "residuum of filth" to the Penobscot River. Citizens argues that this fact makes the City a PRP because the City was an "operator" of the hazardous-substance-releasing sewer facility at the time of disposal and an "arranger" of the hazardous-substance disposal. [FN22] (Docket No. 176 at 9-11.) The City disavows this contention, arguing that "[c]ourts have uniformly rejected claims that local governments may be held liable under CERCLA for mere construction or routine maintenance of a sewer system, absent some showing that the municipality had knowledge that the effluent contained hazardous substances and issued a permit or otherwise participated in the discharge of the hazardous substances." (Docket No. 205 at 10.)

**FN22.** Citizens's argument that the City has "arranger" status is found in a footnote in its primary memorandum. It appears to have been offered to cover all the bases, although Citizens does not argue that the City qualifies as a person "who accepted any hazardous substances for transport to disposal" under section 107(a)(4). (Docket No. 176 at 11 n. 12.). "Arranger" status most commonly relates to "generators of waste" and there is no evidence in the summary judgment record that the City generated any of the tar residue. However, there are a number of cases that address the issues surrounding non-generator liability pursuant to § 107(a)(3). *See* William B. Johnson, Annotation, *Arranger Liability of Nongenerators Pursuant to § 107(a)(3) of Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C.A. 9607(a)(3)), 132 A.L.R. Fed.*

*77, 103-04 (1996).* The City's predicament is certainly novel, but could well fall within the general category.

Pursuant to § 107(a)(2), CERCLA liability attaches to "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." *42 U.S.C. § 9607(a)(2).* The definition of "facility" includes any "pipe or pipeline" or "ditch." *Id.* § 9601(9). The definition of "operator" is tautological: "any person ... operating such facility." *Id.,* § 9601(20)(A). In *United States v. Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), the Supreme Court held that "an operator must manage, direct or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste." *Id . at 66.*

The Nineteenth Century installation of the so-called Old Stone Sewer or Davis Brook Sewer in this case constituted an "operation," and it is apparent that the installation had to do with the disposal of hazardous waste. The language of § 107(a)(2) is considerably broader than the language of § 107(a)(1); § 107(a)(2) concerns "any person" operating "any facility" where and when the subject hazardous waste is disposed of. Thus, owner/operator status under § 107(a)(2) is not restricted to ownership or operation of the facility at which response costs are being incurred, but turns on where and how the hazardous substances at issue were disposed of. Here, the City's theory of the case prevents the City from denying that the sewer was "a" facility at which the hazardous substances at issue were disposed. The only conceptual obstacle raised by the City is, essentially, that a sewer functions passively, therefore the City did not really "operate" it. But this reasoning is strained, because the sewer came to be as a consequence of the City's exercise of the power of eminent domain. Such an exercise would seem to rise to the level of operation, for the sewer facility could not have operated but for its installation.

The arranger argument is also attractive, and does not suffer from similar conceptual problems. Pursuant to § 107(a)(3), liability attaches to "any person who by contract, agreement, or otherwise arranged for disposal ... of hazardous substances owned or possessed ... by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances." *42 U.S.C. § 9607(a)(3).*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Although this language is perhaps most often utilized to impose liability on the generators of hazardous waste when their generating facility is remote from the disposal facility, [FN23] *see, e.g., Northeastern Pharm. & Chem. Co., 810 F.2d 726*, there is no logical reason why this expansive language does not extend to the circumstances of this case. "[C]ourts have concluded that a liberal judicial interpretation [of § 107(a)(3)'s 'arranged for' language] is consistent with CERCLA's 'overwhelmingly remedial' statutory scheme." *United States v. Aceto Agric. Chems. Corp., 872 F.2d 1373, 1380 & n. 8 (8th Cir.1989)* (discussing how Congress's adoption of the language, "arranged for," rather than the competing language, "caused or contributed to," is "consistent with the imposition of strict liability"). Here the City exercised its power of eminent domain to arrange for the installation of a sewer to drain hazardous substances from the former gas plant facility into the Penobscot River facility (*i.e.*, it "otherwise arranged for disposal").

> FN23. Note that persons who transport hazardous wastes from a generator facility to a disposal facility are generally considered not subject to section 107(a)(3) "arranger" liability where the transporter "ha[s] not selected the disposal site." *United States v. Davis,* 1 F.Supp.2d 125, 130-31 (D.R.I.1998) (discussing cases and citing Johnson, *supra*, note 22, at 103-104).

*11 Nothing in the cases cited by the City suggests that it is immune from liability for such sewer activities. The leading case on state agency or municipal liability under CERCLA for sewer operations is *Westfarm Assocs. Ltd. Partnership v. Washington Suburban Sanitary Comm'n,* 66 F.3d 669 (4th Cir.1995), *cert. denied,* 517 U.S. 1103, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996). In *Westfarm,* the Fourth Circuit Court of Appeals reviewed a summary judgment determination that the Washington Suburban Sanitary Commission (WSSC) was liable for response costs based on releases (leaks) from a poorly constructed or maintained sewer line. *Id.* at 673. Although the basis for § 107 liability was WSSC's present ownership of the facility at issue, among the issues squarely addressed on appeal was WSSC's "most prominent" contention: that public policy required the Court to recognize an exemption for sewer operators "from [CERCLA] liability for damage caused by wastes dumped in the sewers by third par-

ties." *Id.* The Court considered the contention and rejected it, observing that CERCLA was clearly intended to impose legal obligations on both public and private entities, including liability for cleaning up environmental contamination. *Id.* at 678. As for crafting a public policy exception, the *Westfarm* Court concluded, "While the public policy arguments raised by WSSC may be meritorious, we can only presume that those arguments were weighed and rejected by Congress when it enacted CERCLA without including a broad exemption for state and local governments or their [publicly owned treatment works]." *Id.* at 680, *cert. denied,* 517 U.S. 1103, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996). Also persuasive is *Unites States v. Union Corp.,* 277 F.Supp.2d 478 (E.D.Penn.2003), in which the District Court for the Eastern District of Pennsylvania concluded that the City of Philadelphia would be a potentially responsible party under CERCLA if its combined stormwater/sanitary sewer outfall "released contaminants into the mudflat" (a part of the contaminated site at issue in the case). *Id. at 488. See also Carson Harbor Village, Ltd. v. Unocal Corp.,* 287 F.Supp.2d 1118, 1194 (C.D.Cal.2003) (declining to find municipal defendant liable as operator based merely on evidence that they "regulated and maintained [a] storm drain system leading to the [contaminated] property" in the absence of evidence that they did "anything more than 'stand by and fail to prevent the contamination.' ") (quoting *Long Beach Unified Sch. Dist. v. Dorothy B. Godwin Living Trust,* 32 F.3d 1364, 1368 (9th Cir.1994)).

In my assessment, the City of Bangor qualifies as a PRP with respect to the tar slick facility not only because it owns the inter-tidal zone, but also by virtue of its Nineteenth Century connection (quite literally) to the disposal of hazardous substances from the former gas plant into the Penobscot River. The summary judgment facts make it apparent that the City exercised its powers of eminent domain to effectuate or facilitate the construction in the middle part of the Nineteenth Century of an enclosed sewer drain that was installed specifically for the purpose of carrying away the waste of the private company that owned and operated the former gas plant. Not only did the City thereby facilitate the alleged 100-plus years of hazardous waste disposal of which it now complains, but it also designated the Penobscot River as the appropriate disposal facility. As a consequence, the City would be potentially liable for the tar slick in a suit commenced by the United States or an innocent party who performed a clean up because the City exercised

Not Reported in F.Supp.2d                                                                                                Page 16
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
(Cite as: 2004 WL 483201 (D.Me.))

control over the sewer installation, an "operation" specifically related to pollution and an "arrange [ment] for disposal [FN24] or ... for transport [FN25] for disposal" of hazardous substances from the generating facility directly to the River facility. 42 U.S.C. § 107(a)(3). This is more than standing by and failing to prevent contamination, as described in *Carson Harbor*. This is contribution toward contamination on par with that present in *Westfarm* and implicates CERCLA's strict liability regime. And although the activity seems rather stale, dating as it does to the mid-Nineteenth Century, there is no bar to the imposition of retroactive liability under CERCLA. "CERCLA by its terms has unlimited retroactivity. Indeed, every court of appeals to consider the question has concluded that Congress intended CERCLA to apply retroactively." *Commonwealth Edison Co. v. United States,* 271 F.3d 1327, 1351 (Fed.Cir.2001) (citing *Northeastern Pharm. & Chem. Co.,* 810 F.2d at 732 and *United States v. Monsanto,* 858 F.2d 160, 174 (4th Cir.1988)). It seems beyond peradventure that the City would be a PRP under § 107 if it arranged today for the installation of a pipeline to discharge a manufacturer's hazardous waste directly into the Penobscot River in order to enable public utilities for the benefit of its citizens. Such direct arrangement of and contribution toward hazardous waste disposal also effectively prevents the City from seeking refuge in the third-party defense, 42 U.S.C. § 9607(b)(3). [FN26] *See, e.g., Westfarm,* 66 F.3d at 682-83, ("WSSC had the power to abate the foreseeable release of [hazardous substances], yet failed to exercise that power."), *cert. denied,* 517 U.S. 1103, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996). I therefore recommend that the Court find that the City is a PRP with respect to the tar slick in the Penobscot River.

> FN24. I think it is appropriate for the Court to pin PRP status on the City based on both § 107(a)(3) "arranger" status and (a)(2) "operator" status because both concepts fit comfortably with the facts pertaining to the City's involvement with, participation in or facilitation of this particular sewer installation.

> FN25. The term "transport" is defined as the "movement of a hazardous substance by any mode." 42 U.S.C. § 9601(26).

> FN26. This entire case has to be placed in its historical context. Imagine a municipality

today exercising its municipal authority to obtain an easement over others' property in order to enable a private manufacturing company to discharge its "residuum of filth" directly into the Penobscot River and then arguing in court that it was entitled to assert the third-party defense under CERCLA because the current release of the tar in the river was "caused solely ... by the act or omission of a third party." 42 U.S.C. § 9607(b)(3). Yet everything that happened in this case vis-à-vis the actual generation of the tar at the gas plant happened before Citizens discontinued its operation of the plant in 1963. By 1972, the year in which the Clean Water Act was passed and Senator Edmond Muskie observed that we had ignored for too long "the grim realities of lakes, rivers, and bays where all forms of life have been smothered by untreated wastes," the tar residue at issue in this case was already either deposited in the Penobscot River or migrating underground toward the river. 118 CONG. REC. 33,692 (1972), *reprinted in* 2 LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972, at 161-62 (1973); *see also* 92 Cong. Senate Debates 1972, at 33,692 (LEXIS). Within CERCLA's statutory framework, retroactive responsibility for clean up costs is assigned to those who are historically responsible for the current release. I just do not see how that does not include the City of Bangor, the current owner of the riverfront inter-tidal zone where the tar now rests and the former "operator/arranger" of the sewer installation that brought it there.

*4. Sovereign immunity.*

**\*12** In the event that the Court should find PRP status based on the City's connection to the sewer, as recommended, the City argues that it is entitled to sovereign immunity for sewer activities because, as a matter of law, its Nineteenth Century sewer activities were conducted in agency to the State, which is protected from CERCLA liability pursuant to the Eleventh Amendment. (Docket No. 205 at 13-14 (citing *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (overruling *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)
**(Cite as: 2004 WL 483201 (D.Me.))**

2273, 105 L.Ed.2d 1 (1989)).) The obvious answer to this argument is that the City is forgetting who the plaintiff is in this action. Nothing about this case exposes the City or the State to liability to a private party. This is a case brought by the City against a private party. Furthermore, the mere determination that the City qualifies as a PRP and therefore cannot maintain a *federal* cause of action could not possibly offend the Eleventh Amendment. In any event, "a political subdivision of a state cannot claim sovereign immunity under the Eleventh Amendment." *United States v. Township of Brighton,* 153 F.3d 307, 324 n. 2 (6th Cir.1998) (citing *Monell v.. Dep't of Soc. Servs.,* 436 U.S. 658, 691 n. 54, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

### Conclusion

For the reasons stated herein, I DENY the City's Motion to Deem Facts Admitted (Docket No. 249) and RECOMMEND that the Court GRANT Citizens's Motion for Partial Summary Judgment (Docket No. 176) by entering a judgment that the City is precluded from obtaining a "full recovery" [FN27] of all of its response costs from Citizens in its CERCLA § 107 claims (Counts I and II), as a matter of law, but not dismissing Counts I and II to the extent that they can be read as requesting the imposition of more limited, equitable liability on Citizens's part, assuming for present purposes that such relief is available.

FN27. Citizens refers to these claims as the City's "joint liability claims." (Docket No. 176 at 12.) I characterize them as "full recovery" claims, as did the First Circuit Court of Appeals in *UTC,* 33 F.3d at 99.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

Not Reported in F.Supp.2d, 2004 WL 483201 (D.Me.)

END OF DOCUMENT