**HONORABLE ROBERT J. BRYAN**

**UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT TACOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No.: 3:08-cv-05722-RJB |
| Plaintiff and Counterclaim-Defendant, | |
| v. | REPLY IN SUPPORT OF COUNTERCLAIM-DEFENDANT THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| **WASHINGTON STATE DEPARTMENT OF TRANSPORTATION,** | |
| Defendant and Counterclaimant. | NOTED ON MOTION CALENDAR FOR: November 19, 2010 |

**REPLY IN SUPPORT OF COUNTERCLAIM-DEFENDANT THE UNITED STATES'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

1

**INTRODUCTION AND SUMMARY**

2      The United States seeks summary judgment on Counterclaimant Washington State

3   Department of Transportation's ("WSDOT's") claim that the United States Army Corps of

4   Engineers ("the Corps") is liable under the Comprehensive Environmental Response,

5   Compensation, and Liability Act ("CERCLA") because it issued permits to third parties to

6   dredge in the Thea Foss Waterway (formerly City Waterway and hereinafter "the Waterway").

7      In its Motion for Partial Summary Judgment ("Mot."), Dkt. 103, the United States identified

8   a number of permits issued by the Corps under section 404 of the Clean Water Act ("CWA"), 33

9   U.S.C. § 1344, and section 10 of the Rivers and Harbors Act ("RHA"), 33 U.S.C. § 403, and

10  argued that, as a matter of law, the issuance of those permits does not give rise to CERCLA

11  liability.  WSDOT opposed that motion, mainly arguing that (a) in addition to formally granting

12  permits to dredge, the Corps "required" and informally gave permission for third parties to

13  dredge, and (b) because Congress authorized a navigation project in the Waterway in 1902, the

14  Corps had "complete control" of the Waterway and therefore qualifies as an "operator" and

15  "arranger" under CERCLA.  See WSDOT's Response to Counterclaim-Defendant the United

16  States' Motion for Partial Summary Judgment ("Resp."), Dkt. 130, at 2-3, 4-10 & 13-17.

17     WSDOT's assertions that the Corps "required" dredging and gave informal permission to

18  dredge in the Waterway outside the permit process might initially appear to create a factual

19  dispute.  Those assertions, however, are not supported by the documents on which WSDOT

20  relies and, in any event, do not prevent granting summary judgment on the core legal issue of

21  whether the Corps is liable under CERCLA where its involvement in a dredging project was

22  limited to formally issuing permits under the CWA and the RHA.  Furthermore, Congress'

23  authorization of a navigation project in the Waterway does not mean that the United States had

24  "complete control" over the Waterway, and therefore qualifies as an "operator" or "arranger"

25  under CERCLA.  That argument is belied by the record, and has no basis in the case law.

26  Therefore, the United States' Motion for Partial Summary Judgment should be granted.

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

**I.  WSDOT's Claims that the Corps "Required" and Informally Granted Permission for Private Dredging Outside the Permit Process Are Unsupported and, in Any Event, Do Not Create An Issue of Material Fact Preventing Summary Judgment.**

The United States has moved for summary judgment regarding the Corps' grant of CWA section 404 and RHA section 10 permits to private parties for projects that included dredging in the Waterway. WSDOT attempts to avoid summary judgment by asserting "facts" extraneous to that issue, claiming that, outside of the permit process, the Corps also "required" or informally gave other parties permission to dredge the Waterway.  But there is a large gap between WSDOT's factual assertions and the documents on which it relies.  And even if WSDOT's assertions were supported, that would not prevent the Court from granting summary judgment on the issue presented by the United States' Motion: whether the Corps is liable under CERCLA for the issuance of CWA § 404 and RHA § 10 permits.

   A.  WSDOT's Claim that the Corps "Required" Third Parties to Dredge
       Outside the Permit Process is Unsupported and Irrelevant.

WSDOT's assertion that the Corps "required" other parties to dredge in the Waterway outside the formal permit process (Resp. at 4-5 & 8) is irrelevant to the issue presented by the United States' Motion: whether there is CERCLA liability where the Corps granted specific CWA and RHA permits, but had no further involvement in the permitted projects.  See Mot. at 1-2.  The instances of dredging that WSDOT alleges were "required" by the Corps are not associated with formal permits, and so they do not inform the key issue of whether the Corps had sufficient involvement with or control over the projects for which it issued permits so as to give rise to CERCLA liability.  Thus, even if WSDOT's assertion were true, it would not prevent summary judgment on the issue raised by the United States.

Moreover, even if the assertion that the Corps "required" other parties to engage in unpermitted dredging was somehow material to resolving the United States' Motion, the documents cited by WSDOT do not support this assertion.  The only entity that the Corps ever suggested should do some dredging in the Waterway on its own was another public entity with

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

1   its own regulatory obligations related to the Waterway – the City of Tacoma, which the Corps

2   opined in 1912 should be responsible for removing deposits from the city's sewer lines.  See

3   Resp., Ex. 3 to Northrip Declaration[1] at 95000545 (letter to the City Engineer).  Major J.B.

4   Cavanaugh of the Corps later noted, however, that while "some work has been done from time to

5   time by the City in removing deposits" near the sewers, "*no attempt has been made to require*

6   the removal [by the City] of the gradual accumulations" of sediment in the Waterway, and "it is

7   not anticipated that this dredging will be undertaken" by the City.  Resp., Ex. 8 at 95000535

8   (Corps report dated May 5, 1914) (emphasis added).  WSDOT asserts that further "City action"

9   was required in 1914, but the letter cited simply suggested that the President of the Tacoma

10  Chamber of Commerce "take up with the City some method of *preventing* the shoaling" caused

11  by the sewers – not ask the City to dredge.  Resp., Ex. 9 at 95000559.  And the "matter of

12  redredging" mentioned in correspondence between the Corps and the City in 1915 was the

13  possibility of maintenance dredging "to be done by the United States" – not the City.  Id. at

14  95000566.  Thus, Corps records and correspondence affirmatively show that, while the City

15  occasionally removed its own sewage deposits, the Corps neither could nor did require the City

16  of Tacoma to re-dredge the Waterway, but instead took that obligation upon itself.

17      Furthermore, the correspondence relied on by WSDOT shows only that the Corps asked two

18  private parties to repair the bulkheads on their properties – not to dredge.  See Resp., Ex. 9 at

19  95000568-72.  Around 1914, the Corps began to consider doing maintenance dredging[2] due to

20  the numerous complaints it was receiving regarding the condition of the Waterway.  See id. at

21  95000555, 558 (complaints from private parties); 95000556 (Corps report discussing

22  maintenance dredging); 95000559 (letter stating that the Corps was "making a complete survey

23  of the waterway, to determine its present condition").[3]  Logically, the Corps did not want to do

---

[1] Hereinafter, all exhibits to the Northrip Declaration will be cited as "Resp. Ex. X."

[2] The Corps ultimately conducted maintenance dredging eight times between 1917 and 1949; however, the Corps' own maintenance dredging lies outside the scope of the United States' Motion for Partial Summary Judgment.

[3] In doing so, the Corps did not "make clear that the contaminated nature of the sewage deposits was irrelevant" to the issue of dredging, as WSDOT states (Resp. at 5); rather, it simply noted that the property owner had complained

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

any maintenance dredging until the main causes of the shoaling[4] requiring such re-dredging had been addressed.  See id. at 95000556 (Corps report discussing maintenance dredging). Therefore, in 1915, the Corps asked two property owners adjacent to the waterway to "cooperate" by repairing the defective bulkheads on their property before the Corps engaged in maintenance dredging (id. at 95000568-69 (letters to property owners)), so that sediment would not enter the Waterway through those bulkheads and cause further shoaling (see id. at 95000556 (Corps report noting: "it is probably that some shoaling along the frontage on the waterway has occurred through defective bulkheads").  The companies responded that they would, as requested, make repairs *to their bulkheads*.  Resp., Ex. 9 at 95000570-72.  The Corps did not ask them to do any dredging, and they did not propose to do any dredging.  Id. at 95000568-72.

There is also no evidence that the Corps "required" Northern Pacific Railroad Company to dredge the Waterway, as WSDOT claims (see Resp. at 5) – or even that the dredging in question was actually done.  While Standard Oil complained to the Corps of shoaling near property it rented from Northern Pacific Railroad Company, and the correspondence between the three parties indicates that the railroad offered to dredge to address the problem, there is absolutely no indication in the cited correspondence that the Corps "required" the railroad to dredge.  See Resp., Ex. 3 at 95000539 ("statement was made that it was the *intention of your office* to arrange to do what dredging was necessary and to repair the bulkheads at the point complained of by Standard Oil Company") (emphasis added).  And there is no evidence that the railroad ever did the dredging; rather, Standard Oil later complained that "the railroad company has done no dredging" and the Railway admitted that "dredging has been delayed."  Id. at 9500538, 540.

Finally, WSDOT's further assertion that three entities who appear to have hired the contractor used by the Corps for maintenance dredging to do additional dredging alongside their property were "required" to do such dredging by the Corps (Resp. at 7-8) is also unsupported.

---

"of the offensiveness *of the sewer itself*," but that such "sanitary aspect[s] of the case" were not within the Corps' purview.  Resp., Ex. 3 at 95000545 (emphasis added).

[4] The term "shoaling" refers generally to the accumulation of sediment or other solid matter.

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

1   While a letter from the contractor concerning the payment it received from one of those parties

2   (which happened to be one of the companies that had previously agreed to repair its bulkhead)

3   references an "agreement" between that party and a Corps employee, there is no indication of

4   what, exactly, that "agreement" was – and thus no indication that the Corps "required" this

5   dredging.  Whatever this letter means (which is admittedly unclear),[5] it plainly does not show

6   that the Corps "required" private parties to dredge.  See Resp., Ex. 14.  And there is absolutely

7   no evidence that the other two companies that appear to have hired the contractor used by the

8   Corps to dredge near their properties were "required" to do so by the Corps.  See Resp., Ex. 13.[6]

9       Thus, WSDOT's assertion that the Corps required private parties to dredge is not supported

10  by the documents it cites and so, even if it were relevant to the issue raised by the United States'

11  Motion, it does not create an issue of material fact that would prevent summary judgment in the

12  Corps' favor.  And most importantly, as explained above, the question of whether the Corps

13  "required" parties to engage in dredging *outside the permit process* has no bearing on the

14  question of whether, when it granted *formal permits* allowing dredging in the Waterway, it

15  became an "operator" or "arranger" within the meaning of CERCLA.  Therefore, WSDOT

16  cannot defeat the Corps' motion for summary judgment by raising this extraneous issue.

---

[5] Interpreting it in the manner most favorable to WSDOT, this letter might be read to suggest that the Corps had agreed that this contractor could contract for private dredging in addition to doing the Corps' own maintenance dredging.  But even if this could be construed as some kind of tacit approval of private dredging by the Corps, as discussed in section 1(B), that would not prevent the Court from granting summary judgment on the issue of whether the Corps is liable under CERCLA where it issues dredging permits under the CWA and RHA.  And the letter could also be interpreted as indicating that this company had agreed to contribute financially to the Corp's own maintenance dredging (which is not addressed by the Motion) – or, perhaps most logically, as simply referring to that company's previous agreement with the Corps to repair the bulkhead on its property before any dredging, public or private, was done.  See Resp., Ex. 14.  Under either interpretation, this letter would still be irrelevant to the issue presented by the United States' Motion for Partial Summary Judgment.

[6] The letter cited by WSDOT makes clear that the contracts for these instances of private dredging were separate from the government's contract for public maintenance dredging.  See Resp., Ex. 13 (distinguishing hours spent and cubic yards dredged "on the government contract" from time and amounts dredged for the private  parties).

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

B.  WSDOT's assertion that the Corps granted third parties informal "permission" to dredge outside the permit process is also unsupported and irrelevant.

In addition to WSDOT's assertion (discussed above), that the Corps "required" dredging outside the permit process, WSDOT also claims that the "USACE sometimes gave 'permission' to dredge . . . without issuing a formal permit."  Resp. at 5.  This assertion is also unsupported.  While the evidence indicates that the Corps may have been *aware* of some private dredging for which there is no record of a permit, there is no evidence that the Corps gave its "permission" for those projects.  Instead of pointing to any such evidence, WSDOT leaps to the conclusion that the Corps must have granted permission for those projects because the Waterway was a "navigation project," and so dredging in the Waterway could not have taken place without the Corps' permission.  Resp. at 4, 7-8.  Such unsupported speculation does not, however, create an issue of material fact.  Furthermore, like WSDOT's assertion that the Corps "required" dredging outside the permit process, this assertion is completely irrelevant to the issue raised by the United States' Motion – whether issuing formal CWA and RHA permits, without any further involvement in the permitted projects, gives rise to potential CERCLA liability for releases of hazardous substances resulting from those projects.

*i.    No evidence shows that the Corps informally granted permission to dredge.*

To support this claim, WSDOT points first to dredging done by Standard Oil and Northern Pacific in 1906, arguing that because USACE "inspected" the dredging and recorded it in reports on the Waterway, this shows that "USACE permitted this private dredging" and had "control over such activity."  Resp. at 5.  But the documents WSDOT cites indicate that the Corps found out about the project only when it happened to inspect the Waterway and observed that the project was underway, and then could only guess as to who had commissioned it.  See Resp., Ex. 7 at 95000524 ("The City Waterway was inspected only when this office was called up by phone relative to some infraction . . . . A clam shell dreger[sic], *presumably* hired by [Standard Oil] and R. R. Co., has been engaged recently . . . .") (emphasis added).  WSDOT points to no evidence of any Corps involvement in this dredging activity other than the fact that, after finding out about it,

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

1    the Corps Engineer inspected it and recorded it in his reports on the Waterway.  See Resp., Ex. 7.

2    This plainly does not constitute "active involvement" in the project sufficient to make the Corps

3    an "operator," see Washington v. United States, 930 F. Supp. 474, 483 (W.D. Wash. 1996), or

4    "intentional steps to dispose of a hazardous substance" sufficient to make the Corps an

5    "arranger," see Burlington N. & Santa Fe Ry. v. United States, 129 S. Ct. 1870, 1879 (2009).

6        WSDOT also bases its claim that the Corps informally gave private parties permission to

7    dredge the Waterway on conclusory assertions, rather than evidence; specifically, that, given the

8    existence of a navigation project in the Waterway, "any non-USACE entity conducting dredging

9    in the Waterway necessarily did so with the permission of USACE."  Resp. at 4; see also Resp.

10   at 7 ("such work could not have been done in or near the navigation project without USACE

11   permission and supervision" and "without USACE permission, the contractor would not have

12   been available to perform the private work").  But such unsupported speculation[7] does not create

13   a genuine issue of material fact.  See Order on Plaintiff's Motion for Partial Summary Judgment

14   on Arranger Liability for Coal Tar Discharges, Dkt. 136, at 3 ("nonmoving party must present

15   specific, significant probative evidence, not simply 'some metaphysical doubt'") (quoting

16   Matshushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

17       Lastly, WSDOT points to a chart from the 1985 Remedial Investigation commissioned by the

18   Washington Department of Ecology, claiming that it lists two modern-era dredging projects not

19   identified by the Corps in its Motion, and to another chart from the 1991 Commencement Bay

20   Cumulative Impact Study, which WSDOT characterizes as a "more extensive" list of "USACE-

21   permitted private activities" than that provided by the United States in its Motion.  Resp. at 10.

22   WSDOT cites these documents as evidence that "informal practices persist" and "some private

23   dredging may have been permitted without the issuance of complete formal permits."  Id.

24

25

26   _____

[7] WSDOT's conclusion that the Corps must have approved any activity in the Waterway is based in large part on its
assertion that, because the Waterway was a federal "navigation project," the Corps had "complete control" over the
Waterway.  Resp. at 3-4.  As discussed below in section II, this reasoning is erroneous.

REPLY - 7

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

1   To begin with, these documents provide no evidence that the Corps informally granted

2   permission to dredge outside the permit process. Both are lists of *permits* – not informal grants

3   of permissions. Resp., Exs. 17 (listing dredging projects by "permittee") & 18 (entitled

4   "Summary of Significant Permits"). Therefore, they do not support WSDOT's proposition that

5   there may have been "informal" grants of permission to dredge in modern times.

6       In any event, the chart from the Cumulative Impact Study provides no support for WSDOT's

7   assertion that there were more dredging projects in the Waterway than identified by the Corps in

8   the Motion, whether permitted or unpermitted. It contains only *two* entries stating that there was

9   dredging in the Waterway, whereas the Corps identified *seven* permitted dredging projects in the

10  Waterway during that time period. Compare Mot., Ex. A ¶¶ 15-17 with Resp., Ex. 18.[8] The rest

11  of the entries identify work done in a *different waterway*, or in Commencement Bay itself. See

12  Resp., Ex. 18. Thus, this list is "more extensive" than the list of projects provided in the Motion

13  only in that it includes dredging projects in completely different waterways. And while the other

14  chart referenced by WSDOT might initially appear to list two Corps permits not identified by the

15  United States in the Motion, upon closer inspection, one of those entries – identifying a permit

16  granted to "S. Jones" in 1981 – plainly concerns the same permit identified by the United States

17  as having been granted that year to the West Coast Development Group. Compare Resp., Ex. 17

18  with Mot., Ex. A, Attachment 5. The plans included with that permit list the application as "by

19  S. Jones," and it was signed by a Scott J. (the rest of the surname is unintelligible). Mot., Ex. A,

20  Attachment 5 at USCD0000543-47. Thus, at best, this chart might be read to suggest that the

21  Corps may have granted *one* permit for work in the Waterway that was not identified in the

22  United States' Motion. But even assuming that to be true, it would not impact the outcome of

---

[8] There is a third entry stating that 7,000 cubic yards of "silt and bark" was dredged at the end of "City/Middle peninsula," which does not indicate that there was dredging in the City Waterway, but rather at the point where the strip of land between City and Middle Waterways touches Commencement Bay. Resp., Ex. 18 at 72. None of the entries identify the permittee or the year the permit was granted (see Resp., Ex. 18), and thus there is not enough information to identify the specific permits to which they refer.

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

1    the Motion.  Whether the Corps granted seven permits or eight, the issue of whether the grant of

2    such permits can give rise to CERCLA liability remains the same.

3                    ii.    *WSDOT's claim that the Corps allowed unpermitted dredging is irrelevant.*

4    Even if there were a factual dispute as to whether the Corps informally gave its permission

5    for private parties to dredge, that issue is irrelevant to the resolution of the United States'

6    Motion.  The United States has moved for summary judgment in regard to the Corp's grant of

7    CWA section 404 and RHA section 10 permits, raising the issue of whether that purely

8    regulatory activity gives rise to CERCLA liability.   Whether, in other instances, the Corps failed

9    to issue a permit and instead informally allowed dredging to proceed has no bearing on that

10   issue.  Accordingly, WSDOT's claim that this occurred does not provide a basis for the Court to

11   decline to grant summary judgment in favor of the Corps on the issue presented by the Motion.

12   **II.   WSDOT's Argument that the Corps Had "Complete Control" Over the Waterway, and
        Is Therefore Liable Under CERCLA, Because the Waterway Was a Federal Navigation
13      Project is Factually Incorrect and Legally Unsound.**

14   As explained by the United States in its Motion, issuing permits to dredge pursuant to

15   CWA § 404 and RHA § 10 is insufficient to give rise to CERCLA liability absent evidence that

16   the Corps initiated, designed, conducted, directed or supervised the projects it "permitted."  See

17   Mot. at 14-22.  Apparently recognizing this, WSDOT offers a new, much broader theory of

18   liability.  Specifically, WSDOT argues that because the Waterway is a Congressionally-

19   authorized "navigation project," that alone is sufficient to establish the Corps' liability for any

20   dredging projects that took place therein, because it means that the Corps had "complete control"

21   over all activities in the Waterway.  See Resp. at 3-4, 13-14, & 16-17.  This argument must fail.

22   WSDOT offers the 1902 Act of Congress, which listed the Waterway as one of many federal

23   "navigation projects," as the primary evidence for its assertion that the Corps had "complete

24   control" over the Waterway.  See Resp. at 2-3 (citing Resp., Ex. 1 (1902 Act, 32 Stat. 331-84)).[9]

25   But that Act did not give the Corps "complete control" over the projects it designated; rather, it

26
    ----
    [9] Indeed, the 1902 Act authorized hundreds of navigation projects, see Resp., Ex. 1 at 331-70, and it is illogical to
    think that the Corps could "completely control" all of these sites (Resp. at 3).

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

1  shows that the Corps was limited in its authority to ensuring that the Waterway became and

2  remained navigable.  The Act gave the Corps a certain amount of money to be "expended . . . for

3  the construction, completion, repair, and preservation" of the Waterway, and authorized the

4  Secretary of War to (a) enter into a contract to spend the allocated money, and (b) "prescribe . . .

5  rules and regulations" for the use and administration of the Waterway.  Resp., Ex. 1 (1902 Act)

6  at 331, 347, & 374.  Day to day management of the Waterway – *e.g.,* decisions regarding

7  industrial development, or what ships could enter and leave on what schedule – lay outside the

8  Corps' authority under the 1902 Act (see generally Resp., Ex. 1), and would therefore have been

9  undertaken by the Port of Tacoma, the City of Tacoma, or not at all.

10     The other two documents cited by WSDOT as confirming the Corps' "complete control" of

11  the Waterway also do not do so.  In the 1920 public hearing cited by WSDOT, a private citizen

12  characterized the Waterway as being under government "supervision" – not "control" – and then

13  stated that he understood that private users did not own the Waterway or have rights to it beyond

14  the right to use it alongside other private users, similar to a user's right to public road.  See

15  Resp., Ex. 4 at 95000722.  The Corps "concede[d]" that unremarkable proposition.  Id.  And

16  Thomas Mueller, a former Corps Regulatory Branch Chief, only testified that, because the

17  Waterway was a navigation project, the Corps could "make sure that it stayed navigable" (Resp.,

18  Ex. 5 at 34:4-22), thus confirming that the Corps' power under the 1902 Act is to ensure the

19  navigability of the Waterway, not to exercise "complete control" over it.[10]

20     Second, WSDOT's argument that the Waterway's status as a federal navigation project

21  makes the Corps an "operator" and "arranger" under CERCLA finds absolutely no support in the

22  case law.  To the contrary, as detailed in the United States' Motion, the applicable case law

23

24

25

26

---

[10] The only use of the word "control" at all within the exchange was by counsel for WSDOT, who summarized Mr. Mueller's prior testimony regarding the Corps' right to maintain the navigability of the Waterway as: "So in a navigation project area, at least, the Corps essentially maintained the right to keep the navigation project entirely clear to control whatever was in there?"  Resp., Ex. 5 at 35:24 – 36:2.  This summary by counsel obviously does not establish that Corps personnel view the Corps as having "complete control" over the Waterway.

REPLY - 10

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

uniformly holds that a regulator's issuance of permits, or its failure to require permits, does not give rise to CERCLA liability.  See Mot. at 17 & 20 (discussing six cases so holding).

In regard to operator liability, WSDOT argues that, because the Waterway was a navigation project, it was "a government facility" that the Corps "macromanaged," and so the Corps' "failure to exercise its control over others is a basis for liability."  Resp. at 14-15 (citing United States v. Township of Brighton, 153 F.3d 307, 315 (6th Cir. 1998)).  But the fact that the Corps had a statutory duty to maintain the navigability of the Waterway does not make it a government "facility."  The Corps does not own the Waterway.[11]  Moreover, in Brighton, the court only explained that "[o]nce affirmative acts have been found to render someone an operator," that entity can't avoid liability by arguing that it did not control the specific acts leading to releases. 153 F.3d at at 315.  It did not suggest that the exercise of regulatory authority, whether cast broadly under the 1902 Act or more narrowly under the CWA and the RHA, constitutes an "affirmative act" that makes the regulator an operator in the first place.  Id.  Furthermore, while the court, in Brighton, described a township's involvement with a dump as "macromanagement" and concluded that that involvement might give rise to operator liability, it so concluded because the township had directly contracted with the owner of the facility, arranged "for bulldozing and other maintenance when [the owner] himself proved unequal to the task," and "took responsibility for ameliorating the unacceptable condition of the dump."  Id. at 315-16.  That sort of hands-on involvement is simply not present here.  The Corps was not "running the facility" but "merely regulating it," and therefore is not an operator.  See id. at 316 n.11.[12]

In regard to arranger liability, WSDOT argues that the Corps exercised "actual control" over the disposal of hazardous substances within the meaning of United States v. Shell Oil Co., 294 F.3d 1045 (9th Cir. 2002), as it "exercised a very high level of control over the Thea Foss

---

[11] There is no doubt that the City, the entities who use the Waterway, and (in any other context) the State would strenuously object to any such suggestion.

[12] The implications of WSDOT's argument that the mere existence of a federal navigation project at a site subjects the Corps to liability under CERCLA for any releases of hazardous substances at that site, regardless of its level of involvement in the specific activities leading to those releases, are obviously vast.

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

Waterway because it was both a navigable water and a Congressionally-authorized navigation project."  Resp. at 16.  But in <u>Shell Oil</u>, the Ninth Circuit concluded that the United States did *not* have "actual control" over waste disposal where "the waste never belonged to the United States" and no U.S. official or employee had managed its disposal.  294 F.3d at 1057-58.  The same is true here: the material dredged by the permittees or their contractors during the course of the permitted projects was never owned or possessed by the United States, and no Corps official participated in, conducted, directed, or supervised the permitted projects as they were undertaken.  Furthermore, in <u>Shell Oil</u>, the oil companies argued that the United States "could" have exercised actual control over the waste because it "had ultimate authority to exercise such control," <u>id.</u>, which is essentially the same argument that WSDOT makes here.  But the Ninth Circuit did not agree that such "authority to control" the waste disposal was "sufficient without more."  <u>Id.</u>  This Court should similarly decline to hold that the Corps' general regulatory authority over a federal navigation project is sufficient, without more, to establish arranger liability for any activities that took place therein.[13]

## CONCLUSION

For all these reasons and those set forth in its Motion, the United States requests that this Court grant its motion for partial summary judgment.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

 /s/   Amanda Shafer Berman
AMANDA SHAFER BERMAN

---

[13] Beyond its reliance on the Corp's alleged control of the Waterway pursuant to the 1902 Act, WSDOT argues that arranger liability is established here because, when it granted permits or permission to dredge, the Corps "knew that the permittees would transport and dispose of the dredge spoils."  Resp. at 16.  But here, as in <u>Burlington Northern</u>, knowledge, by itself, is "insufficient" to prove that the Corps is an arranger.  <u>See</u> <u>Burlington Northern</u>, 129 S. Ct. at 1880.  WSDOT itself argued in a previous filing that "knowledge alone is insufficient to prove that an entity planned for the disposal," citing <u>Burlington Northern</u>.  Dkt. 121 at 19 (WSDOT opposition to summary judgment motion regarding arranger liability for coal tar contamination).

REPLY - 12

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

ROBERT H. FOSTER
United States Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington D.C.  20026-3986
Phone: (202) 514-1950
Email: amanda.berman@usdoj.gov

Dated: November 18, 2010

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2010, I electronically filed the foregoing Reply in Support of Counterclaim-Defendant the United States' Motion for Partial Summary Judgment with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record for WSDOT:

Deborah Lee Cade
Attorney General's Office
Transportation and Public Construction Division
PO Box 40113
Olympia WA 98504-0133
360-753-6126
deborahc@atg.wa.gov

Ian A. Northrip
Attorney General's Office
Transportation and Public Construction Division
PO Box 40113
Olympia WA 98504-0133
360-753-1628
iann@atg.wa.gov

Amanda G. Phily
Attorney General's Office
Transportation and Public Construction Division
PO Box 40113
Olympia, Wa 98504-0113
360-753-1622
amandap1@atg.wa.gov

Dated: October 20, 2010

 /s/   Amanda Shafer Berman
Amanda Shafer Berman
Trial Attorney, Environmental Defense Section
Environment and Natural Resources Division
United States Department of Justice

REPLY - 1

U.S. Dep't of Justice, Environmental Defense Section,
P.O. Box 23986, Washington, D.C. 20026-3986
Filing Attorney's Direct line: 202-514-1950