UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:08-cv-05722 RJB |
| Plaintiff and Counterclaim-Defendant, | ORDER GRANTING THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| v. | |
| WASHINGTON STATE DEPARTMENT OF TRANSPORTATION, | |
| Defendant and Counterclaimant. | |

This matter comes before the Court on Counterclaim-Defendant the United States' Motion for Partial Summary Judgment.  Dkt. 103.  The Court has considered the pleadings filed in support of and in opposition to the motion and the remaining file herein.

## I.  FACTUAL AND PROCEDURAL HISTORY

The primary underlying facts of this case are well known by the Court and the parties and will not be repeated herein.

On January 30, 2009, the Washington State Department of Transportation ("WSDOT") filed a counterclaim against the United States seeking contribution under section 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9613(f), based on allegations that (1) the United States Army Corps of Engineers ("USACE") dredged the Thea Foss Waterway ("Waterway") between 1902 and 1949, and (2) permitted others to dredge the Waterway in the 1970s and the early 1980s and possibly other years as well.  Dkt. 10.

WDSOT alleged that the United States is a potentially responsible person ("PRP") liable for contribution under 42 U.S.C. § 9613(f) because USACE's permitting activities qualify it as an "operator" of the Waterway, an "arranger" of the disposal of hazardous substances in the Waterway, and/or a "transporter" of hazardous substances to the Waterway under 42 U.S.C. §§ 9607(a)(2), (3), and (4), respectively.  *Id*.

On July 6, 2009, the United States filed a motion for partial judgment on the pleadings, seeking, in part, judgment on the matter of whether the United States is liable under CERCLA for granting dredging permits to third parties.  Dkt. 24.  On September 15, 2009, the Court issued an order denying the United States' motion on the permitting issue.  Dkt. 10.  In its order, the Court noted that "USACE's liability, if any, will not be based on actual possession of the waste but rather on what level of involvement the USACE engaged in when granting permits for dredging and disposing of dredged materials."  Dkt. 47, at 10.  The Court stated that while the record was insufficiently developed at that stage to decide the permitting issue, "further discovery is warranted to determine if liability is under 42 U.S.C. § 9607 is applicable."  Dkt. 47, at 11.

ORDER GRANTING THE UNITED STATES'
MOTION FOR PARTIAL SUMMARY
JUDGMENT- 2

On October 10, 2010 and after the completion of discovery, the United States filed this motion for partial summary judgment on the permitting issue alleged in WSDOT's counterclaim. Dkt. 103. The United States contends that its evidence shows that because USACE's involvement in third parties' dredging was "purely regulatory," WSDOT cannot establish that USACE is liable under section 113(f) of CERCLA, 42 U.S.C. § 9613(f), based on the issuance of permits to private parties that authorized dredging or disposal activities in the Waterway. Dkt. 103, at 6. The United States also contends that even if the USACE were considered a potentially responsible party, the "third party defense" provided in 42 U.S.C. § 9607(b)(3) applies. Dkt. 103, at 23.

The United States contends that the Seattle District of the USACE issues permits that include dredging and disposing of dredged material under two statutory authorities: Section 10 of the Rivers and Harbors Act ("RHA"), 33 U.S.C. § 403, and section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344. Dkt. 103-1. According to the United States, when the USACE receives a permit request pursuant to section 10 of the RHA or section 404 of the CWA, it conducts a "broad analysis" to determine whether to grant a permit, including criteria such as "environmental considerations, fisheries, wildlife, major species, [and] historical [considerations]." Dkt. 103-6, at 5. Additionally, USACE would receive comments from relevant state and federal agencies as well as reactions through a public notice and comments system. Dkt. 103-6, at 22-23.

In granting a permit to allow dredging, USACE would apparently place conditions on dredging operations. For example, USACE employees were "trained to put the amount of material, the type of disposal, the type of dredging, quantities, all in the drawings" attached to permits. Dkt. 103-6, at 18. The effect of placing this information in the drawings attached to the

1   permits served to "essentially limit[] the dredging" to the criteria and conditions set forth in the

2   drawings attached to the permit.  *Id.*  While the USACE may place conditions on a permit, the

3   United States contends that the USACE does not design a dredging project for entities that

4   request permits.  Dkt. 103, at 7.  According to the United States, "it is the permittee, not the

5   permitting agency, that decides where to dredge, how much to dredge, and what type of

6   equipment to use."  *Id.*  As a result, the United States argues that the USACE does not "operate,

7   conduct, manage, direct or supervise the projects" for which it issues permits under CWA section

8   404 or RHA section 10.  Dkt. 103, at 8.

9        On November 4, 2010, WSDOT filed a response.  Dkt. 130.  WSDOT contends that there

10  are disputed issues of fact regarding (1) the extent of USACE-permitted dredging and (2) how

11  much control the USACE exercised over the Waterway and its polluted sediments.  Dkt. 130, at

12  1.  WSDOT contends that several facts establish the extent to which the USACE was involved in

13  granting permits to dredge in the Waterway.  Dkt. 130, at 2.

14       First, WSDOT points to a 1902 Act of Congress that appropriated money for public

15  works for the Waterway and other waterways around the country to support its contention that

16  the USACE "controlled" the Waterway.  Dkt. 131-1 (Act of June 13, 1902, ch. 1079, § 1, 32

17  Stat. 331).  WSDOT contends that because the Act granted the USACE "complete control of the

18  use, administration, and navigation" of projects such as the Thea Foss Waterway, the USACE

19  was Congressionally-mandated to exert dominance over all activities that took place there.  Dkt.

20  130, at 3.

21       Second, WSDOT contends that several examples of correspondence from the early

22  twentieth century between the USACE and third parties demonstrate that the USACE "required"

23  the third parties to conduct dredging operations in the Waterway.  Dkt. 130, at 4-9.  According to

24

ORDER GRANTING THE UNITED STATES'
MOTION FOR PARTIAL SUMMARY
JUDGMENT- 4

1  WSDOT, because the USACE "required" these operations, it effectively controlled when and

2  where third parties would dredge in the Waterway.  *Id.*

3          Finally, WSDOT argues that more recent permitting activities by the USACE

4  demonstrates that the USACE retains "control" over the Waterway and the dredging operations

5  that take place within it.  Dkt. 130, at 9-11.  WSDOT contends that because the USACE issues

6  permits not as a disinterested regulator, but as "the entity that operates and controls the

7  navigational project" that is the Waterway, any action that takes place within the Waterway that

8  may affect its navigability would necessarily be conducted with the acquiescence of the USACE.

9  *Id.*

10         On November 18, 2010, the United States filed a reply.  Dkt. 138.  In its reply, the United

11  States contends that WSDOT's contention that the USACE "controlled" the Waterway is

12  unsupported by relevant facts.  *Id.*  Additionally, the United States argues that even if the

13  evidence that WSDOT sets forth is accepted as true, it does not create a genuine issue of material

14  fact as to whether there is CERCLA liability when the USACE granted specific permits pursuant

15  to its authority under the RHA and CWA.  *Id.*

16                          **II.  <u>SUMMARY JUDGMENT STANDARD</u>**

17         Summary judgment is proper only if the pleadings, the discovery and disclosure materials

18  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

19  movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is

20  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

21  showing on an essential element of a claim in the case on which the nonmoving party has the

22  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

23  of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

24

ORDER GRANTING THE UNITED STATES'
MOTION FOR PARTIAL SUMMARY
JUDGMENT- 5

1   for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

2   (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

3   metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a

4   material fact exists if there is sufficient evidence supporting the claimed factual dispute,

5   requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty*

6   *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

7   *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

8          The determination of the existence of a material fact is often a close question.  The court

9   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

10  e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, T.W. *Elect.*

11  *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

12  of the nonmoving party only when the facts specifically attested by that party contradict facts

13  specifically attested by the moving party.  The nonmoving party may not merely state that it will

14  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

15  to support the claim. *T.W. Elec. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

16  Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

17  be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

18          **III.DISCUSSION**

19          To establish the United States' liability for contribution under section 113(f) of

20  CERCLA, 42 U.S.C. § 9613(f), WSDOT must establish that the USACE falls within one of the

21  classes of "persons" enumerated in section 107(a) of CERCLA, 42 U.S.C. § 9607(a). *See* 42

22  U.S.C. § 9613(f)(1) ("Any person may seek contribution from any other person who is liable or

23  potentially liable under section 9607(a) of this title").  Under section 107(a) of CERCLA, 42

24

ORDER GRANTING THE UNITED STATES'
MOTION FOR PARTIAL SUMMARY
JUDGMENT- 6

1  U.S.C. § 9607(a), the classes of persons that may give rise to liability include "operators,"

2  "arrangers," and "transporters."  42 U.S.C. § 9607(a).

3      The United States argues that because the USACE's permitting activities do not qualify it

4  as an operator, arranger, or transporter under section 107(a) of CERCLA, the USACE cannot be

5  held liable for contribution under section 113(f) of CERCLA as a result of its permitting

6  activities.  Dkt. 103, at 14.  In its response, WSDOT concedes that the United States is not liable

7  as a transporter under CERCLA.  Dkt. 130, at 1-2.

8      The primary question that remains, then, is whether the USACE's permitting activities

9  creates liability for the USACE as either an operator under section 107(a)(2) of CERCLA, 42

10 U.S.C. § 9607(a)(2), or as an arranger under section 107(a)(3) of CERCLA, 42 U.S.C. §

11 9607(a)(3).  If summary judgment is not granted on either of those issues, then the "third party

12 defense," 42 U.S.C. § 9607(b)(3), must be addressed.

13     A.  Operator liability

14     Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), provides that a party may be

15 liable if, at the time of disposal of any hazardous substance, it "operated" the facility "at which

16 such hazardous substances were disposed of."  Pursuant to the definitions provided in Section

17 101(9) of CERCLA, 42 U.S.C. § 9601(9), the "facility" in question here is the Waterway itself,

18 or some larger area of which the Waterway forms a part.

19     The Supreme Court clarified the standard for CERCLA operator liability in *United States*

20 *v. Bestfoods*, 524 U.S. 51 (1998).  In assessing the liability of a parent corporation for the actions

21 of its subsidiary, the Court stated:

22     [U]nder CERCLA, an operator is simply someone who directs the workings of,
       manages, or conducts the affairs of a facility. To sharpen the definition for the
23     purposes of CERCLA's concern with environmental contamination, an operator
       must manage, direct, or conduct operations specifically related to pollution, that

24

is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

Id. at 66-67 (1998).  The analysis of whether a party is the "operator" rests on the relationship between that party to the facility itself.  *Id*. at 68.

Ninth Circuit case law identifies two theories on which operator liability may be premised.  *See Steadfast Ins. Co. v. United States*, 2009 WL 3785565 (C.D.Cal. November 10, 2009).  The first theory is the "authority to control test" explained in *Kaiser Aluminum v. Catellus Development Corp.*, 976 F.2d 1338 (9th Cir.1992).  *See State of Washington v. United States*, 930 F.Supp. 474, 483 (W.D.Wash.1996).  Under the "authority to control test," operator liability attaches "if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment."  *Kaiser*, 976 F.2d at 1341.

The second theory is the "actual control" standard articulated in *Long Beach Unified School Dist. v. Dorothy B. Godwin California Living Trust*, 32 F.3d 1364 (9th Cir.1994).  *See State of Washington*, 940 F.Supp. at 483.  Under the "actual control" standard, to be an operator of a facility, an entity "must play an active role in running the facility, typically involving hands-on, day-to-day participation in the facility's management."  *Long Beach*, 32 F.3d at 1367.

The United States relies on *United States v. Township of Brighton*, 153 F.3d 307 (6th Cir. 1998) to support its contention that when a regulator (such as the USACE) engages in "purely regulatory activity," such action "does not suffice to render a government entity liable" as an operator.  *Brighton*, 153 F.3d at 316.  Under *Brighton*, "the dispositive question" is "whether the government entity was running the facility or merely regulating it."  *Id*. at 316, n.11.  As the concurring opinion further explained, a regulator's activities can only give rise to operator liability "where its involvement extends beyond mere regulation and amounts to substantial control, or active involvement in the activities of the facility."  *Id*. at 325 (Moore, J., concurring

1    in result).  At the same time, however, the *Brighton* court noted that "mere regulation does not

2    suffice to render a government entity liable, but actual operation (or "macromanagement") does."

3    *Id.* at 316.

4         Also illuminating is the Third Circuit case of *FMC Corp. v. United States Dep't of*

5    *Commerce*, 29 F.3d 833 (3rd Cir. 1994).  There, the Court held that the United States was liable

6    as an operator of a World War II industrial facility under the "actual control" standard when the

7    United States

8         determined what product the facility would manufacture, controlled the supply
         and price of the facility's raw materials, in part by building or causing plants to be
9         built near the facility for their production, supplied equipment for use in the
         manufacturing process, acted to ensure that the facility retained an adequate labor
10        force, participated in the management and supervision of the labor force, had the
         authority to remove workers who were incompetent or guilty of misconduct,
11        controlled the price of the facility's product, and controlled who could purchase
         the product.

12   *Id.* at 844.  WSDOT relies on *FMC Corp.* for operator liability by arguing that the USACE

13   "explicitly controlled all aspects of the…Waterway" by "taking vigorous and repeated actions to

14   maintain the full width and depth of that project."  Dkt. 130, at 15.

15        Given the case law, the proper standard to determine whether the USACE is subject to

16   operator liability for issuing permits is driven by the Supreme Court's interpretation in *Best*

17   *Foods* as applied in the "actual control" standard in *Brighton*.  Furthermore, cases such as *FMC*

18   *Corp.* provide an example of the type of "control" that an entity must exert before operator

19   liability may attach.

20        Here, WSDOT fails to meet its burden by demonstrating a genuine issue of material fact

21   as to whether the USACE's permitting activities create operator liability under section 107(a)(2)

22   of CERCLA, 42 U.S.C. § 9607(a)(2).

23

24

1    First, WSDOT's reliance on the 1902 Act does not suggest that the USACE exerted

2 "hands-on, day-to-day control" of the management of the Waterway (*Long Beach*, 32 F.3d at

3 1367) or that the USACE managed, directed, or conducted third party dredging operations in the

4 Waterway (*Bestfoods*, 524 U.S. at 66-67).  The Act grants the USACE the duty to "prescribe

5 such rules and regulations for the use, administration, and navigation *of any or all canals and*

6 *similar works of navigation* that now are, or that hereafter may be, owned, operated, or

7 maintained by the United States…"  Dkt. 131-1, at 45 (emphasis added).  Included in this list of

8 "any or all canals" is the Waterway, as well as presumably hundreds of other public works.

9 While the Act does grant to the USACE some domain over the Waterway, it can hardly be said

10 that the Act provides that the USACE has "hands-on, day-to-day control" of the management of

11 the Waterway.

12    Second, the correspondence that WSDOT relies on to establish that the USACE

13 "controlled" the Waterway is not persuasive and does not establish a genuine issue of material

14 fact.  Correspondence between the USACE and third parties could have demonstrated that the

15 USACE had a significant level of involvement when granting permits for dredging and therefore

16 implied that the USACE "managed, directed, or conducted operations" specifically related to

17 dredging in the Waterway.  *Bestfoods*, 524 U.S. at 66-67.  However, the evidence in this case

18 does not suggest that conclusion.

19    Contrary to the assertions of WSDOT, the correspondence does not establish that the

20 USACE "required" any third party to conduct dredging operations.  The documents relied on by

21 WSDOT show that the USACE was involved in back and forth discussions that differ

22 significantly from the conduct of the United States in *FMC Corp.*  As noted above, the Third

23 Circuit held in that case that the United States was liable as an operator when the government

24

ORDER GRANTING THE UNITED STATES'
MOTION FOR PARTIAL SUMMARY
JUDGMENT- 10

1   affected to a significant degree nearly every aspect of an industrial facility. *FMC. Corp.*, 29 F.3d

2   at 844.  While the evidence in this case shows that the USACE and third parties discussed

3   dredging operations, it does not show that the USACE planned specific dredging operations or

4   decided specifically when, where, or how a dredging operation would take place.

5           Furthermore, courts have found the United States not liable as an operator where the

6   government was more involved with the facilities in question than the permitting activities in this

7   case.  *See, e.g. United States v. Iron Mountain Mines, Inc.*, 987 F.Supp 1277, 1287-88 (E.D. Cal.

8   1997) (United States was not an operator even though it provided financing and subsidies in

9   addition to acting as a regulator); *State of Washington,* 930 F.Supp. 485-86 (concluding United

10  States could not be considered an operator where it had exercised oversight of shipyard activities

11  in order to promote efficiency and control costs).

12          Finally, permits issued by the USACE pursuant to the RHA and the CWA show that the

13  USACE was not engaged in day-to-day, hands-on management of the Waterway.  Particularly

14  relevant to this conclusion are facts established by the United States that are not rebutted by

15  WSDOT.  The USACE does not design a dredging project for a third party but merely assesses

16  whether or not a permit should be granted.  Dkt. 103-5, at 9.  It is the third party that decides

17  where to dredge and how much material will be dredged.  Furthermore, the USACE was not

18  required to conduct an after-action inspection for every project.  Dkt. 103-6, at 15.  For those

19  projects that did not require an after-action inspection, the USACE would not necessarily know

20  whether a project was performed in the manner in which it was permitted.  *Id*.  The evidence

21  shows that the USACE's level of involvement in the permitting process pursuant to the RHA and

22  the CWA does not rise to a level such that the USACE managed, directed, or controlled the third

23  party dredging operations.  *Bestfoods*, 524 U.S. at 66-67.

24

ORDER GRANTING THE UNITED STATES'
MOTION FOR PARTIAL SUMMARY
JUDGMENT- 11

1   The USACE's permitting activities do not give rise to operator liability pursuant to

2   section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), because there are no genuine issues of

3   material fact as to whether (1) the USACE managed, directed, or controlled third party dredging

4   operations or (2) the USACE had hands-on, day-to-day control of the management of the

5   Waterway.  Accordingly, the United States should be granted summary judgment on the issue of

6   operator liability with regards to its permitting activities.

7       B.  Arranger liability

8       Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), provides that arranger liability

9   arises when "any person who by contract, agreement, or otherwise arranged for disposal or

10  treatment…of hazardous substances owned or possessed by such person, by any other party or

11  entity, at any facility…owned or operated by another party or entity and containing such

12  hazardous substances." 42 U.S.C. § 9607(a)(3).

13      While the term "arranged for" is not defined in CERCLA, courts have explained the

14  concept.  For example, one court determined that the issues involved in determining arranger

15  liability under CERCLA are distinct from those involved in determining owner or operator

16  liability.  *Basic Management Inc. v. United States*, 569 F.Supp.2d 1106, 1116 (D.Nev. 2008).

17  Indeed, "arranger liability requires active involvement in the arrangements of disposal of

18  hazardous substances. However, control is not a necessary factor in every arranger case.  The

19  Court must consider the totality of the circumstances ... to determine whether the facts fit within

20  CERCLA's remedial scheme.... [T]here must be a 'nexus' that allows one to be an arranger." *Id*.,

21  *quoting Coeur D'Alene Tribe v. Asarco, Inc.,* 280 F.Supp.2d 1094, 1130-31 (D.Idaho 2003).

22      There are two lines of cases in the area of direct arranger liability: (1) "traditional"

23  arranger liability cases in which "the sole purpose of the transaction is to arrange for the

24

ORDER GRANTING THE UNITED STATES'
MOTION FOR PARTIAL SUMMARY
JUDGMENT- 12

1    treatment or disposal of the hazardous wastes," *United States v. Shell Oil Co*., 294 F.3d 1045,

2    1054 (9th Cir.2002) (citations omitted), and (2) "broader" arranger liability, in which "control is

3    a crucial element of the determination of whether a party is an arranger." *Id*. at 1055.  With

4    respect to the broader arranger liability, the court noted that "[t]here is no bright-line test, either

5    in the statute or in the case law, for a broad theory of arranger liability under § 9607(a)(3).

6    Rather, we are required to sort through the fact patterns of the decided cases in order to find

7    similarities and dissimilarities to the fact pattern of our case." *Id*. at 1055-56.  After evaluating

8    the cases identified by the *Shell Oil* court as broader arranger liability cases, the applicable

9    standard was identified by one district court as follows: "Arranger liability requires a person to:

10   (1) own or possess waste and arrange for its disposal; or (2) have the authority to control and to

11   exercise some actual control over the disposal of waste."  *Coeur D'Alene Tribe*, 280 F.Supp.2d

12   at 1132.

13       More recently, the Supreme Court articulated principles regarding arranger liability that

14   are useful here.  In *Burlington Northern and Santa Fe Railway Company v. United States*, 129 S.

15   Ct. 1870 (2009), the Court stated that interpreting the language of CERCLA required giving it its

16   "ordinary meaning" and concluded that "under the plain language of the statute, an entity may

17   qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a

18   hazardous substance."  *Id*. at 1879.

19       Here, WSDOT is unable to overcome the United States' motion for summary judgment

20   under either the *Shell Oil* standard or the principles articulated in *Burlington Northern.*

21       First, the United States did not exercise "actual control" over the hazardous substances to

22   the extent it establishes arranger liability under *Shell Oil*.  In that case, the Ninth Circuit

23   concluded that the United States did not have "actual control" over waste disposal where "the

24

ORDER GRANTING THE UNITED STATES'
MOTION FOR PARTIAL SUMMARY
JUDGMENT- 13

1   waste never belonged to the United States" and no U.S. official or employee had managed its

2   disposal.  *Shell Oil*, 294 F.3d 1057-1058.  In this case, WSDOT does not meet its burden of

3   proving arranger liability by demonstrating a genuine issue of material fact by showing (1) that

4   the USACE owned or possessed the hazardous substances, or (2) that a United States official or

5   employee arranged for or managed the disposal of the hazardous substances.  Additionally, the

6   USACE had neither the authority to control nor exercised actual control over the disposal of the

7   hazardous substances.

8          Second, there is no indication that the United States took intentional steps to dispose of

9   the hazardous substances that were apparently dredged by the third parties.  *See Burlington*

10  *Northern*, 129 S. Ct. at 1879.  The USACE performed its regulatory function by issuing permits

11  to third parties in an attempt to maintain the navigability of the Waterway.  The evidence

12  presented by WSDOT does not establish that the USACE took intentional steps to dispose of the

13  hazardous substances, particularly when one considers the evidence that shows that the USACE

14  itself did not undertake the work that it permitted and did not design the third party dredging

15  projects.

16          Finally, the Supreme Court in *Burlington Northern* also stated that the fact that the

17  defendant had taken precautionary steps to attempt to prevent the entities to which it was selling

18  from leaking or spilling hazardous substances further supports the conclusion that the defendant

19  there did not intend to dispose of hazardous substances.  *Burlington Northern*, 129 S. Ct. at 1880.

20  Here, the USACE's inclusion of general and specific conditions in the permits that it granted,

21  aimed at protecting human health and the environment (Dkt. 103-6, at 19-20), implies that the

22  USACE was not intending to arrange the disposal of hazardous substances.

23

24

1    The USACE's permitting activities do not give rise to arranger liability pursuant to

2    section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), because there are no genuine issues of

3    material fact as to whether the USACE (1) owned or possessed the hazardous substances and

4    arranged for their disposal, (2) had the authority to control and exercised some actual control

5    over the disposal of the hazardous substances, or (3) took intentional steps to dispose of the

6    hazardous substances that were apparently dredged by the third parties.  Accordingly, the United

7    States should be granted summary judgment on the issue of arranger liability with regards to its

8    permitting activities.

9        C.  Third party defense

10   As stated above, the United States should be granted summary judgment on both the

11   issue of operator liability and arranger liability.  Accordingly, the Court need not determine

12   whether the United States should also be granted summary judgment on the issue of a "third

13   party defense" pursuant to 42 U.S.C. § 9607(b)(3).

14                         **IV. ORDER**

15   Therefore, it is hereby **ORDERED** that the United States' motion for partial summary

16   judgment (Dkt. 103) is **GRANTED**.  WSDOT's counterclaim seeking liability on the United

17   States under section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for the USACE's issuance of

18   permits to private parties that authorized dredging or disposal activities in the Thea Foss

19   Waterway is **DISMISSED**.

20

21

22

23

24

ORDER GRANTING THE UNITED STATES'
MOTION FOR PARTIAL SUMMARY
JUDGMENT- 15

1   The Clerk is directed to send uncertified copies of this Order to all counsel of record and

2 to any party appearing pro se at said party's last known address.

3   Dated this 7th day of December, 2010.

4

5

6         ROBERT J. BRYAN
          United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER GRANTING THE UNITED STATES'
MOTION FOR PARTIAL SUMMARY
JUDGMENT- 16